1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF OKLAHOMA
 2

 3  AUDREY MYERS, Personal             )
    Representative of the Estate of    )
 4  MICHAEL EDWIN SMITH, now deceased, )
                                       )
 5            Plaintiffs,              )
                                       )
 6  vs.                                )No. 17-CV-90-RAW
                                       )
 7  BOARD OF COUNTY COMMISSIONERS      )
    OF MUSKOGEE COUNTY; ROB FRAZIER,   )
 8  SHERIFF OF MUSKOGEE COUNTY, in his )
    Official Capacities; TURN KEY      )
 9  HEALTH CLINICS, LLC; and DOES      )
    II through XX;                     )
10                                     )
              Defendants.              )
11

12

13            VIDEOTAPED DEPOSITION OF

14         CHARLES STANLEY PEARSON, JR.

15      TAKEN ON BEHALF OF THE PLAINTIFF

16           IN MUSKOGEE, OKLAHOMA

17           ON SEPTEMBER 15, 2018

18

19      REPORTED BY:  KAREN B. JOHNSON, CSR

20

21

22

23

24

25
```

MSJ EX. 2

Charles Pearson                              September 15, 2018

Page 34

 1   whether it be 1:00, 2:00 in the morning when I got

 2   the phone call, I didn't wait, to make sure that

 3   that inmate was being taken care of.

 4           You know, you try to micromanage and you

 5   try to do the very best you can, because just like

 6   everyone in this room has children, parents,

 7   friends, has relatives they care about and they

 8   want -- they all want to be assured that when their

 9   loved one or friend or whatever is in that facility

10   that they are taken care of.  And I think that my

11   actions over the past 16 years, the due diligence I

12   did and the policy and procedures and the -- the

13   state-of-the-art camera system that -- that at the

14   time and probably still does outweighs, is better

15   than any camera system in any facility in the state.

16   You know, that's pretty much where I wanted to go

17   with that, but, you know.

18       Q    When Michael was admitted into the

19   facility, on that same day, there were medical

20   records that were faxed to the nurse practitioner --

21       A    Yes.

22       Q    -- that actually demonstrated what

23   Michael's history was.

24       A    Yes.

25       Q    Did you have any involvement in that or

Charles Pearson                          September 15, 2018

Page 41

1    in your facility?

2       A    No, I can't say that I believe or

3    disbelieve.  I know he had Stage IV cancer and it is

4    not easy.  I believe -- you know, I know Mike

5    suffered.  You know, Lowell, we've had, in my

6    career, I can't tell you how many inmates have come

7    through that facility and were terminal and there

8    wasn't nothing we could do for them.

9       Q    Sheriff, go ahead, I'm sorry.

10      A    It's just, you know, this is one of those

11   things where we can debate it all day long, you

12   know.  I had a minor heart attack recently and, you

13   know, there's just -- there's just so much that

14   people can do for you, the rest is left up to you,

15   and it's -- it's a fact of getting older and -- but

16   I don't -- I don't think Turn Key, and I definitely

17   don't think Nurse Smith would overlook any person.

18   I stand firm with that and that's one of the reasons

19   he was my physician before Turn Key come in, I

20   believe that's one of the reasons they kept him.

21      Q    Talking about APRN Smith?

22      A    Yes.

23      Q    What is the reason why you had Turn Key

24   come in?

25      A    Excuse me?

Charles Pearson                        September 15, 2018

Page 42

1        Q     What is the reason why you had Turn -- let
2   me ask you, there's a period of time in which the
3   facility had their own medical staff that was
4   employed?
5        A     Correct.
6        Q     Then there was -- then Turn Key was hired
7   and they were there for about -- from about March of
8   2016 until that contract was terminated.
9        A     Correct.  I tell you, to provide better
10  medical care than what I was able to provide myself,
11  these people, I can't -- I don't have nothing but
12  good things to say about them.  I believe it
13  improved the quality of health care in the facility,
14  I believe inmates were saved because they were
15  there, with their ability to administer Narcan and
16  so many other things that come with this company,
17  you know.  I think it saved the taxpayers a lot of
18  money.  I believe it saved a lot of lives and we'll
19  never know how many.
20       Q     Was it a financial decision to where you
21  were able to contract the services of Turn Key for
22  less than if you had independently provided for the
23  services?
24       A     It was more -- it was more expensive.
25       Q     What was more expensive, Turn Key was?

Charles Pearson                          September 15, 2018

                                                  Page 44
1    when a detainee is confined in your facility and

2    that they're experiencing a medical emergency to

3    make sure that they can get the emergency help that

4    they need; correct?

5         A    Yeah.  And, Lowell, you're asking the

6    questions.

7         Q    Sure.

8         A    And you've been an attorney here.

9         Q    Right.

10        A    And you have called me with medical

11   concerns for your clients, and I was on it just like

12   I would anybody else.  Allen Counts has called me.

13   And I'm going to tell you, if I know of somebody

14   suffering, I'm going to find out.

15        Q    But in this case, you didn't know he was

16   suffering?

17        A    I didn't know it, but if I'd have known

18   it --

19        Q    Because the information, did it get -- at

20   what point did you find out the severity of the

21   situation?

22        A    You served me a tort claim.

23        Q    So it was at that point, so before that,

24   did Turn Key ever notify you?

25        A    No.

Charles Pearson                          September 15, 2018

                                                      Page 45

1        Q     Did --

2        A     I -- Mike -- Mike knows, too.  Mike has

3   sent me notes over the years.  Mike is -- you get

4   ahold -- he knew he could send me a note.

5        Q     Are you talking about --

6        A     From the jail.  Yeah, Mike Smith.

7        Q     Okay.  And, Sheriff, what -- what I'm

8   getting at is that while a detainee is confined in

9   your facility, even though Turn Key is contracted to

10  provide medical services, if that detainee is denied

11  adequate medical treatment, then ultimately, the

12  sheriff of Muskogee County at that time is

13  responsible; correct?

14       A     No, I don't.  That's reason I --

15       Q     Who else?

16       A     -- hired Turn Key.

17       Q     But Turn Key doesn't shirk their

18  responsibility ultimately at the end.  I mean, I

19  understand Turn Key is responsible for providing

20  medical services, but when Turn Key doesn't do that

21  or if they don't do that, then ultimately you're

22  responsible.

23       A     I think they done everything they could

24  within their power for a man with Stage IV cancer.

25  And I tell you what, when God comes knocking on the

Charles Pearson                          September 15, 2018

Page 46

 1   door for you and me, and just like he did my wife,

 2   there's no getting away from it.  Now, we can make

 3   you as comfortable as possible, and I swear to God

 4   on everything that I know, we're going to do that

 5   and I -- and I truly believe that that was done in

 6   this case.  You know, Mike --

 7        Q    Go ahead.

 8        A    Mike -- Mike was his own person, and I

 9   tell you, if I'd have known, I'd have been -- I'd

10   have went and seen him personally.

11             MR. ARTUS:  It's been an hour, let's take

12   a break.

13             MR. HOWE:  Sure.

14             THE VIDEOGRAPHER:  Off the record.

15             (Break taken from 12:02 to 12:14)

16             THE VIDEOGRAPHER:  We are back on the

17   record.

18        Q    (By Mr. Howe)  Sheriff, when you hired

19   Turn Key, you said -- or let me withdraw that

20   question.

21             You said there's so many allegations that

22   you received daily as sheriff; right?

23        A    Well --

24        Q    When you say "allegations," what are you

25   referring to?

Charles Pearson                        September 15, 2018

Page 48

1    is 282, you probably got -- you got people -- you

2    don't have enough room for everybody; right?

3         A    No.

4         Q    As a matter of fact, you got people piled

5    on top of each other, don't you?

6         A    We tried not to, but there was times, yes,

7    we -- I contracted with Craig County Jail, Cherokee

8    County Jail to -- and I would have even 40, 30, 40

9    inmates in these other facilities.

10        Q    Okay.  But at this time, is that what you

11   had?

12        A    You know, whatever you -- you -- I'm sure

13   you've got the figure and I'll -- I'll stipulate to

14   whatever figure you got at the time.

15        Q    You also stated that while -- when you say

16   you received so many allegations from detainees, do

17   you receive so many allegations from detainees in

18   addition to saying that they're sick and they're not

19   getting --

20        A    Families.

21        Q    Oh, families, okay.

22        A    Families, detainees.  You know, they --

23   they could send me a note, and I looked at every

24   one.

25        Q    What are the reasons why a detainee is

Charles Pearson                          September 15, 2018

Page 49

1    sent to detox 115?

2        A    Excuse me?

3        Q    What are the reasons why a detainee would

4    be confined to detox 115 when they were originally

5    housed in general population, cell block 1?

6        A    I don't understand the question.

7        Q    You understand -- or do you know if I say

8    detox 115, that's actually a unit in your facility?

9        A    That's -- that's one of many.  We've got a

10   rubber room 113, 114, 15, all the way up to 111,

11   those are just rooms off of -- now, if you have

12   medical condition or -- or a mental condition,

13   which, unfortunately, that's -- we -- we would put

14   people in those rooms, that way they could be

15   monitored with a camera system at all times, and we

16   could monitor them when they're eating, you know,

17   the jail staff, medical.

18       Q    Do you -- what is the reason why the Turn

19   Key contract ended?

20       A    It didn't end with me.

21       Q    So was that because of the new

22   administration?

23       A    You would have to ask them, Lowell, I

24   don't know.

25       Q    So did Turn Key terminate their -- or did

Charles Pearson                              September 15, 2018

Page 51

1    correct?

2         A    Correct.

3         Q    And you agree with me the denial of

4    medical care to a detainee while they're confined in

5    your facility --

6         A    Violation of policy.

7         Q    And denial of adequate medical care is a

8    violation of their constitutional right; correct?

9         A    Well --

10             MR. ARTUS:  I'm going to object to the

11   form of the question because now you're getting into

12   what the legal standards are for constitutional

13   violation, which is vastly different than a policy

14   violation.  And the law is policy violation isn't a

15   constitutional violation, and if we want to get into

16   it, we can do that off the record or on the record,

17   but as you know, it requires a standard of

18   deliberate indifference.

19        Q    (By Mr. Howe)  When a detainee comes into

20   your facility with a serious medical condition, it's

21   important that your facility know that; correct?

22        A    Correct.

23        Q    It's also important when a detainee comes

24   into your facility if their medical condition

25   worsens, that the facility should know about that;

Charles Pearson                          September 15, 2018

Page 56

1    area; correct?

2         A    Correct.

3         Q    As a matter of fact, when detainees are

4    sent to detox 115, that's also considered a form of

5    punishment; correct?

6         A    No.

7         Q    It's not?

8         A    No.

9         Q    They don't view it as punishment?

10        A    No, we -- we put them down there so we can

11   watch them, there's a reason we -- we got to put

12   them down there, whether --

13        Q    Okay.

14        A    -- they're -- they're sick, they're a

15   bully, they're -- they're -- you know, we got

16   cameras everywhere there, even in the rooms, there's

17   a reason for that.  And the staff is going in and

18   out of there constantly throughout the day bringing

19   people in and out, so they -- I mean, they're there

20   for them to see.

21        Q    So with the staff going in and out there

22   constantly --

23        A    You know, the inmate may think it's --

24   it's punishment or because of that, but, no, we got

25   to watch them and -- and --

Charles Pearson                          September 15, 2018

                                                    Page 57

     1        Q    So who's watching them?

     2        A    Well, the -- the booking, they got windows

     3   right there, they got cameras, they got the guy

     4   right there sitting there, people coming in and out,

     5   officers and deputies, and the staff is going back

     6   there every hour.

     7        Q    So what you're saying is that there should

     8   be eyes on them; correct?

     9        A    In most cases, I mean, 350 inmates, and

    10   detox gets crowded, but it's -- it's the best place

    11   to keep an eye on someone.

    12        Q    You -- you also believe that when you have

    13   somebody that's put in, say, for example, detox 115,

    14   one, for medical observation purposes for allegedly

    15   their own safety, that the facility should know that

    16   they need to -- their employees need to monitor that

    17   patient; right?

    18        A    Yes.

    19        Q    And as a matter of fact, you can't say for

    20   certain whether the facility was actually notified

    21   that Michael Smith was reassigned there for medical

    22   observation; correct?

    23        A    I can't say, I believe it was, based on

    24   what the conversations Jeremy and I had.

    25        Q    Okay.  Well --

Charles Pearson                          September 15, 2018

Page 59

1    he's losing the inability (sic) to walk and that he

2    is -- and that he feels that something is seriously

3    wrong with him, and it's known he has Stage IV

4    metastatic cancer that we continue to refer to as

5    terminal, what was the harm in him not being sent to

6    the hospital?

7              MS. THOMPSON:  Object to form.

8         Q    (By Mr. Howe)  Or excuse me, what was the

9    harm in him being sent to the hospital in that

10   circumstance?

11        A    I don't know what the reasoning was behind

12   that, I don't -- you'd have to ask the nurse and the

13   other employees of Turn Key, as well as the

14   supervisors in the facility.

15        Q    But -- but you agree with me that Turn Key

16   had the authority to make a decision that Michael

17   Smith be sent to the hospital; correct?

18        A    I do.

19        Q    And that wasn't done in this case;

20   correct?

21        A    Not to my knowledge.

22        Q    And you're aware that instead of sending

23   him to the hospital, that he was actually confined

24   to a detox 115 cell for medical observation;

25   correct?

Page 62

1       A     Correct.

2       Q     They can't get to their own food tray;

3   right?

4       A     Correct.

5       Q     And when medical staff, you would expect,

6   is alerted of these issues and requests that he be

7   seen, you expect them to take the proper steps to

8   protect his medical -- Michael Smith's medical

9   needs; correct?

10      A     Absolutely.

11      Q     Generally does the -- it's true that the

12  jail does not assign a wheelchair to somebody who

13  can walk on their own, do they?

14      A     I don't understand.

15      Q     The facility does not provide a wheelchair

16  to somebody that doesn't need one, do they?

17      A     No, no, no.

18      Q     As a matter of fact, usually has to do

19  with their inability to walk; right?

20      A     Correct.

21      Q     Their inability to get around on their

22  own; correct?

23      A     Correct.

24      Q     You would also agree with me that when you

25  hire Turn Key, you expect them to keep adequate

Charles Pearson                                    September 15, 2018

Page 63

1    medical charts; correct?

2         A    Correct.

3         Q    You also expect them, that when they are

4    treating patients in your facility, that you are

5    ultimately responsible for, to know the information

6    related to that patient that's important to their

7    care; correct?

8         A    Yes.

9         Q    Are you aware of in this case of whether

10   Turn Key actually did anything, other than provide

11   -- well, let me ask you this, I withdraw that

12   question.

13            Turn Key has the authority, under the

14   agreement that you have with them, to say that a

15   detainee is -- needs to go to the hospital; correct?

16        A    Yes.

17        Q    During this time period, was this a time

18   in which if an ambulance would be called and then an

19   ambulance would then pick the detainee up and take

20   them to the facility?

21        A    Possibility, yes.

22        Q    Is it also a possibility that the facility

23   staff had the ability to take a detainee to the

24   hospital?

25        A    Every employee of that jail had that.

Page 64

```
 1        Q     So you didn't even need an ambulance to
 2   get there; correct?
 3        A     Yes, didn't, no, no.
 4        Q     As a matter of fact, your facility staff
 5   had the authority, while a detainee was in custody,
 6   to take them to the hospital; correct?
 7        A     Call an ambulance or --
 8        Q     And when the detainee --
 9        A     And they -- we don't get charged for using
10   EMS.
11        Q     Because there's a separate agreement;
12   right?
13        A     No, they just county government, they
14   don't charge us.
15        Q     Sure.  Okay.  So you don't have to pay for
16   Muskogee County EMS; right?
17        A     No.
18        Q     So there's not really --
19        A     As far as expenses, that don't play into
20   this case, I don't believe.
21        Q     Well --
22        A     For taking him to the hospital.
23        Q     So in this case, your facility and Turn
24   Key have a responsibility to communicate regarding
25   Michael Smith while he is confined in your -- while
```

Charles Pearson                           September 15, 2018

                                                    Page 85

 1       A     Correct.

 2       Q     And detainees do not have the ability to

 3  personally call 911 for an ambulance while in

 4  custody from a -- the facility phone, do they?

 5       A     No.

 6       Q     Now, as a matter of fact, the medical

 7  staff has the ability to call 911; correct?

 8       A     Everybody, every employee of that jail has

 9  that ability.

10       Q     And that would also include Turn Key

11  medical staff; correct?

12       A     Turn Key medical on down to the runners

13  and --

14       Q     But detainees do not?

15       A     Do not.  They do not.

16       Q     And, also, when we talk about the kiosk,

17  we talk about is that how they would also access a

18  phone in that section of the facility, once, you

19  know, you got detox 115, the room, and then they get

20  out and then there's the open area where the kiosk

21  is?

22       A     Yes.

23       Q     Is there also a phone there or can you --

24  do you use the phone through that kiosk?  How does

25  that work?

Charles Pearson                                September 15, 2018

Page 97

1    is not --

2            MS. THOMPSON:   Same objection.

3       Q    (By Mr. Howe)  But the medical record is

4    from Cindy Bilyeu, who is not facility staff;

5    correct?

6       A    Well, I don't know.

7       Q    Well, isn't general --

8       A    Based on what the information I got from

9    Jeremy, this was -- this was done just like by the

10   book.

11      Q    Well, Jeremy said he didn't know anything

12   about Michael being sent there because he didn't

13   approve it.

14      A    When we talked, he explained to me where

15   Mike was put, after the tort claim was filed and,

16   you know, all -- whatever medicine and this and

17   that, of course, that's out of my league, but he --

18   he did his best to attempt to explain to me that

19   based on his opinion and mine, I think everything --

20   policy was followed.

21      Q    Can you punish inmates for seeking medical

22   help?

23      A    Absolutely not.  That's not punishment.

24      Q    And a detainee -- and a detention officer,

25   when a detainee, for any reason, is assigned to

Charles Pearson                          September 15, 2018

Page 103

1    case the same as what the actual individualized

2    treatment plan is?

3         A    Well, I mean, you're getting into --

4         Q    Because it's not.

5         A    Well, that's your opinion, Lowell.

6         Q    No, but I understand --

7         A    This is a -- this is a jail facility with

8    350 soul -- 300 to 350 souls in it, and you've got

9    Turn Key, who is a professional organization that

10   their sole purpose is here to help us preserve life,

11   not to preserve us from getting in lawsuits, all

12   right, and -- and, in my opinion, based on my

13   dealings with Turn Key and the things that went on

14   in that facility, I think they saved lives, I think

15   they done everything within their power and

16   knowledge, and with Mike Smith, the -- the nurse, I

17   have full faith that these people done everything

18   within their power to take care of this man.

19            Now, Mike Smith, Mike that I grew up with

20   had his own, you know, communication skills, they

21   had theirs, if there was a breakdown, which I think

22   maybe there was here, I don't know, but I wasn't

23   there, I didn't know about it till after the tort

24   claim, but based on all the information I seen, I

25   think they done everything within their power to

Charles Pearson                              September 15, 2018

Page 104

 1   help Mike.  Now --

 2        Q    So, again, Turn Key -- well, let me just

 3   ask you this --

 4        A    I'm not going to change my opinion,

 5   Lowell.

 6        Q    I'm not asking you to change your opinion

 7   about Turn Key.

 8        A    Okay.

 9        Q    What I am asking you, Sheriff, is to tell

10   me are you aware of a written treatment plan for

11   Michael Smith?

12        A    No, I'm not.  No, I'm not.

13        Q    You would agree with me that it's against

14   policy to leave an inmate laying in their own urine;

15   correct?

16        A    It's more than just policy.

17        Q    As a matter of fact --

18        A    It's a moral.

19        Q    It's inhumane, isn't it?

20        A    It's very inhumane.

21        Q    It's barbaric, isn't it?

22        A    In my opinion, yes.

23        Q    It's -- it's depraved, isn't it?

24        A    You know, I got loved ones, you got loved

25   ones.

Charles Pearson                          September 15, 2018

```
                                              Page 105
 1       Q    Right.  Right.  But it's depraved, isn't
 2   it?  Wouldn't that be depraved?
 3       A    You bet you.
 4       Q    And what about not only leaving them to
 5   lie in their own urine, but their own feces, it's
 6   just as bad, isn't it?
 7       A    It's pretty bad, Brother.  I think you
 8   know -- everybody in this room knows how I feel
 9   about that that knows me.
10       Q    And it's also against policy to not -- for
11   the facility not to perform proper cell checks;
12   correct?
13       A    Absolutely.
14       Q    It's also -- you would agree with me when
15   you have a detainee that has basic needs, detainees
16   have basic needs, and what I would mean by that is
17   they need to have the ability to use a toilet on
18   their own; correct?
19       A    Right.
20       Q    They need to have the ability to clean
21   themselves; correct?
22       A    They need to, they don't always have that.
23       Q    Okay.  But they -- it's something that if
24   they can't do it, somebody needs to help them do it
25   while they're in the facility; correct?
```

Page 107

1   receive medical care while they're in your facility;

2   correct?

3        A    Correct.

4        Q    And it's against policy, when you have a

5   detainee who's unable to use the rest room, it's

6   against policy not to help that detainee use the

7   rest room; correct?

8        A    What?

9        Q    Or to use the bathroom, to use their

10  toilet.  When you have a detainee in your facility

11  that cannot use the toilet on their own, it's

12  against policy to not have your facility staff --

13       A    Right.

14       Q    -- assist them; correct?

15       A    Right.

16       Q    It's also against your policy if they

17  can't clean themself up --

18       A    Yes.

19       Q    -- to -- for your facility staff --

20       A    I think we've made that abundantly clear.

21       Q    Okay.  But I'm -- but it's also against

22  your policy --

23       A    I'll stipulate to that, Brother, I'm going

24  to tell you --

25       Q    Let me ask you if you'll stipulate to it's

Charles Pearson                              September 15, 2018

Page 108

1   against the policy that if a detainee requires

2   assistance to access the toilet so that they could

3   use the rest room, to clean himself up, to keep a

4   clean cell, to bathe themselves, to get their own

5   food tray and be able to eat, to change their own

6   clothes, to take medicine, and to get emergency care

7   if they need it --

8        A    I think we've already covered that.

9        Q    And is it -- what I'm saying, though --

10       A    I've said yes.

11       Q    Let me finish.  But it is against policy

12   that if they can't do those things, that the

13   facility staff is responsible for assisting them in

14   that; correct?

15       A    I totally agree.

16       Q    In review of these records, I have not

17   seen any proof where any person ever approved the

18   housing assignment of reassignment of Michael Smith

19   to detox 115, have you seen any documents that show

20   that?

21            MR. ARTUS:  Object to the form.

22       Q    (By Mr. Howe)  Where the facility staff

23   approved it?  I have where medical -- Cindy Bilyeu

24   actually said that he needed to go there for his own

25   safety, but I'm saying I did not see anything --

Page 111

1   responsibility to provide adequate medical care to

2   the detainees; correct?

3        A    Correct.

4        Q    We also were talking about Turn Key and we

5   were talking about Turn Key, Turn Key's

6   responsibility pursuant to their contract -- have

7   you seen their contract?

8        A    Yes.

9        Q    Okay.  I'm going to hand you what's -- let

10  me see, I'm going to hand you what's been previously

11  introduced in these proceedings as Plaintiff's

12  Exhibit 22.  Do you recognize that?

13       A    Yes, I do.

14       Q    Take a chance to flip through it.  And

15  it's identified, again, as Plaintiff's Exhibit 22,

16  and it's -- on the bottom it says DDR Number 5, and

17  it goes from Pages 97 --

18       A    Yes, I'm very familiar.

19       Q    -- until 109.

20       A    I mean, I haven't read it in a while,

21  but --

22       Q    But it goes to Page 109.

23       A    Yes.

24       Q    So if you look at Page 109, Sheriff, which

25  is the very last page.

Page 112

1       A     Yes.

2       Q     This shows that this is the contract and

3    where it says Charles Pearson, that's your

4    signature; correct?

5       A     Correct.

6       Q     And Flint Junod, he's a CEO or COO for

7    Turn Key; correct?

8       A     Correct.

9       Q     And then this contract's also approved by

10   the county commissioners; correct?

11      A     Right.

12      Q     This is the actual contract that you

13   entered into with Turn Key to provide medical

14   services to the facility; correct?

15      A     Yes.

16      Q     But you did not contract with Turn Key to

17   provide any other services, other than medical;

18   correct?

19      A     No.

20      Q     I also want to turn your attention to what

21   I previously introduced as Plaintiff's Exhibit 20,

22   which is actually -- it says 13-1 on front it, it

23   says DDR Number 5.

24      A     Uh-huh.  Yes.

25      Q     It's Pages 42, and then it goes to 93,

Charles Pearson                          September 15, 2018

Page 121

1      A    Yes.

2      Q    Is it important for you to know when the

3    physician that's been hired by Turn Key is -- is

4    showing up on Mondays and Thursday evenings, is it

5    important for you to know that?  Let me ask you

6    this, I can rephrase this question.

7      A    When I hired them to handle it, I trust

8    them to handle it, and based on what I went through

9    as sheriff and what -- I had 24-hour coverage then

10   and I didn't before.

11     Q    This nurse physician, this is a very

12   important part of providing medical services;

13   correct?

14     A    Everything in here is important.

15     Q    Right.  But what I'm saying is the nurse

16   physician who's supposed -- that's referred to in

17   this as a jail doctor, them visiting twice a week

18   for sick call, that's an important service; correct?

19          MS. THOMPSON:  Lowell, you said nurse

20   physician.

21          MR. HOWE:  No, I said Nurse Smith, who's

22   also -- I said the physician or Nurse Smith or who

23   also is referred to in here as being the person

24   that's the jail doctor.

25          MS. THOMPSON:  I just -- I just wanted to

Charles Pearson                          September 15, 2018

Page 127

1  Number 21 and I want to refer you to Pages Number

2  388 and 389 of this document.

3       A    Let's get to it.

4       Q    No, you need this.  That's your copy, sir.

5       A    Okay.

6       Q    That is actually the document.

7       A    That I just spoke about, medical

8  questionnaire, the triaged when they come in, okay.

9       Q    So in looking at that document -- you just

10 stated that you were aware that Michael Smith had

11 Stage IV metastatic cancer.  On that document, the

12 purpose of that, when they're triaged, is determine

13 what their medical issues are when they come into

14 your facility; correct?

15      A    That's correct.

16      Q    And the responsibility of that is the

17 booking officer; correct?

18      A    Correct.

19      Q    And that document, what that's supposed to

20 do is give you an understanding of what the exact

21 health condition is of that detainee when they're

22 booked in; correct?

23      A    Correct.

24      Q    And looking at that document, one of the

25 ways to verify that the questions that were asked

Charles Pearson                          September 15, 2018

Page 129

 1   --

 2        A    So we'll know.  It's for us, that ain't

 3   for him or you, this is for us and Turn Key, this

 4   ain't for you.

 5        Q    It's not?  Then why is the detainee

 6   required to sign it?

 7        A    He's not required to sign it.

 8        Q    Well, why is there a signature place for

 9   it?

10        A    They had somebody put it on there, OTIS,

11   when they designed this system 20 years ago put that

12   in there, that was back when we used to use cards.

13        Q    So are you saying that it is not --

14        A    This is Muskogee County, Brother.

15        Q    I'm asking, are you saying it is not the

16   policy, practice or procedure of detainees to be

17   required to sign that form?

18        A    No, not to my knowledge, it's not.

19        Q    Are you aware that if you read through the

20   questions that were asked and the answers that were

21   given, it states that Michael Smith had no medical

22   issues?

23        A    Yeah.

24        Q    But we know that's not true; correct?

25        A    We know that now, but we didn't --

Charles Pearson                          September 15, 2018

Page 132

1      A    No.  We'll let them do it after we do

2    their property and all that, then we allow them to

3    sign that, and I think there's another piece of --

4    deal that goes with it, but as far as this, and I

5    can't remember, I've had this discussion with my

6    staff, and I don't remember what -- what it was

7    because it's been so long ago, but this

8    questionnaire was not -- this is a booking

9    questionnaire, they also had another one that we

10   used.  See, this is something --

11     Q    Where is that?

12     A    You going to let me finish?

13     Q    Well, I thought you answered my question.

14     A    No, I'm going to finish.  We -- Turn Key

15   was a fairly new deal, that way we had 24-hour

16   medical coverage.  Now, prior to them coming in, we

17   had a document that our nurse would meet the inmate

18   down there and fill that out, and if she wasn't

19   available, then one of the booking, and they -- I

20   don't think they signed it at all, it was just for

21   our information, are you suicidal, boom, you know,

22   standard questions we've asked ever since 1991 when

23   I started.

24          Now, when Turn Key come in, they may have

25   had a different document that we don't -- I don't

Charles Pearson                                September 15, 2018

Page 137

1        Q     And it's against policy if that physician,

2   in this case, APRN Smith, does not visit twice a

3   week; correct?  Right?

4        A     When I had it, yes, but when -- you know,

5   I don't know what resources they had in there and I

6   don't know what their requirement was and I can't

7   answer for Turn Key.

8        Q     It's against policy to deny a detainee's

9   access to sick call; correct?

10       A     I never deny them that.

11       Q     So that's a yes?

12       A     No, it's not, I'm not going to agree with

13  on something I don't know what you're talking about.

14             MS. THOMPSON:  Lowell, are you referring

15  to Turn Key or jail policies right now?

16       Q     (By Mr. Howe)  I'm talking about in

17  general, Turn Key doesn't get to a detainee,

18  generally speaking, on sick call unless they can put

19  in the request, so what I'm saying is --

20       A     Sure, they can.

21       Q     Is it against -- they get on the sick

22  call?

23       A     I think we got documentation that they did

24  see him several times.

25       Q     Is it -- so let me ask my question again.

Charles Pearson                              September 15, 2018

                                                    Page 138
 1    Is it against policy to deny a detainee's access to
 2    sick call, yes or no?
 3            MS. THOMPSON:  Is that Turn Key policy or
 4    a jail policy?
 5            THE WITNESS:  Yeah.
 6        Q    (By Mr. Howe)  I'm talking about the jail
 7    policy.  Because you --
 8        A    The jail policy is we will give -- we will
 9    supply you adequate medical care and that's what we
10    did.
11        Q    And that means not denying access to sick
12    call?
13        A    Yeah.  I mean --
14        Q    It's also the policy --
15        A    -- who denied him access?  Do you show me
16    where he's denied access?
17        Q    Sir, I'm -- Sheriff, I'm not -- it's okay,
18    let's slow down, I'm not saying that -- I'm telling
19    you or asking you questions about your policy, I'm
20    not -- it's up to the jury to decide.
21        A    Then read the policy, I did.
22        Q    I have, too.
23        A    I wrote it, me and Jeremy wrote it, I know
24    what's in it.
25        Q    Let's slow down, why don't we just see

Charles Pearson                                    September 15, 2018

Page 139

1   if -- my question -- what I'm going to ask you is if

2   your jail policy is this, if this doesn't happen, is

3   it against policy.

4        A    Do you have proof that my employees let

5   him lay in his --

6             MR. ARTUS:  Hold on.

7             THE WITNESS:  You know, I'm sick of this.

8             MR. ARTUS:  Hold on.

9             THE WITNESS:  I'm not getting paid to be

10  here.

11            MR. HOWE:  Let me just get through so you

12  can get out of here.

13       Q    (By Mr. Howe)  Is it against policy to

14  deny prescribed medication to inmates at the lobby

15  window?

16       A    What?

17       Q    Your policy, is it against policy to deny

18  prescribed medications to -- for inmates from like

19  an outside family member that are delivered to the

20  lobby window?

21       A    No.

22            MR. ARTUS:  He's asking you if family

23  members can bring in medicine.

24            THE WITNESS:  Yeah, they can bring

25  medicine, we encourage them to, as long as it's not

Charles Pearson                          September 15, 2018

Page 140

1    scheduled.

2        Q    (By Mr. Howe)  I agree.  And it's against

3    policy to deny them that when they follow the proper

4    procedure; right?

5        A    When they follow the proper procedure.

6        Q    It's against policy to ensure that

7    detainees are thoroughly examined to ensure that

8    they receive proper care; correct?  Right, yes?

9        A    What?

10       Q    Is it against -- it's against policy to

11   ensure that detainees in your facility are

12   thoroughly examined to ensure they receive proper

13   medical care?

14            MR. ARTUS:  You're saying it's against

15   policy for them to deny -- what?

16            THE WITNESS:  That don't make no sense,

17   Lowell.

18       Q    (By Mr. Howe)  It's against policy, excuse

19   me, thank you.  It's -- you would agree with me it's

20   against policy if detainees are not thoroughly

21   examined to ensure that they receive proper medical

22   care?

23       A    We triage them when they come in the door.

24       Q    Okay.  Is it against policy to provide a

25   wheelchair?

Charles Pearson                          September 15, 2018

                                              Page 141

 1        A     What do you mean thoroughly, you mean --

 2        Q     I'll --

 3        A     -- blood pressure, all that, we're not --

 4   I mean, we're not Muskogee ER, I mean, we're

 5   Muskogee County Jail, we don't -- I don't know what

 6   you're getting at, Brother.

 7        Q     It's all right.  I'll just ask you another

 8   question.  Is it against policy to provide a

 9   wheelchair to an inmate that's not in need of one?

10        A     That ain't even in policy.  We'll supply

11   them whatever they need to move around in the jail,

12   that's -- that's -- as long as it's safe for the

13   other inmates, as well as the staff and them.

14        Q     Generally speaking, you don't give

15   wheelchairs to people that don't need them, do you?

16        A     Well, I'm sure we have.

17        Q     But I'm saying generally speaking, your

18   policy is not to give a wheelchair to somebody that

19   doesn't need one; correct?

20        A     Correct.

21        Q     Would you agree with me it's against

22   policy to deny a detainee that's experiencing

23   medical emergency transport to a hospital?

24        A     I'll agree.

25        Q     It's against policy to have inadequate

Charles Pearson                          September 15, 2018

                                                    Page 143

 1   this?

 2       Q    (By Mr. Howe)  Is it against policy for

 3   your facility to fail to preserve evidence?

 4       A    You damn right.

 5       Q    Is it against policy to deny a detainee a

 6   grievance form?

 7       A    Yes.

 8       Q    Is it against policy to deny a detainee a

 9   sick call form?

10       A    Yes.

11       Q    Is it against policy to not ensure a

12   detainee has a working CIN PIN number so they can

13   use the kiosk?

14       A    That's kind of a technical question, I'd

15   have to internalize that one.

16       Q    When you say "internalize," what does that

17   mean?

18       A    Think about it before I answered it, and I

19   haven't -- I don't even really -- those things

20   change, the technology changed, and all of us, you

21   know, I'm not much of a tech, I barely can use this

22   iPhone.

23       Q    Yeah.  Sheriff, but you would agree with

24   me that the PIN number, the CIN PIN number the

25   detainees are assigned is a vital --

Page 158

1   there's some things I know that -- Mike was my

2   friend, and I'm going to tell you, if I had any

3   notion -- and, yes, we communicated, I can't tell

4   you that we did after this or during this, I think I

5   did receive a call or Lisa or one of his relatives

6   and it really bothered me.

7           But as far as, you know, on the record, I

8   want to say that I think Turn Key done a lot for

9   Muskogee County, made things better, no one agrees

10  with the treatment that they're placed in in a jail,

11  I mean, you're confined, you don't have no room,

12  it's miserable, you know.

13          But, you know, for the record and for the

14  family, I'm sorry, and if these things did occur,

15  I'm terribly sorry.  And you're right, the buck

16  stops with me, and I -- if -- if you can show me,

17  I'll take -- I'll take it, I'll take it myself, you

18  know, because it stops with me, and, you know,

19  that's all I got to say.

20          MR. HOWE:  Pass the witness.

21                   CROSS-EXAMINATION

22  BY MR. ARTUS:

23      Q    Mr. Pearson, you would agree, and I just

24  want to clarify, I mean, I think it's been obvious,

25  policy of the jail is to provide medical care to

Charles Pearson                          September 15, 2018

                                                    Page 159

 1    inmates; is that correct?

 2         A    That's correct.

 3         Q    If one of your employees or one -- or one

 4    of Turn Key's employees violated that policy, I

 5    mean, didn't provide medical care, that would be a

 6    violation of your policy?

 7         A    That would be a violation.

 8         Q    It's a -- it's a -- and you had the

 9    contract with Turn Key to provide medical care;

10    right?

11         A    That's right.

12         Q    And that contract required them to be

13    there 24/7, 365; right?

14         A    Yes.

15         Q    Twenty-four hours a day, seven days a

16    week, 365 days a year; right?

17         A    Yes.

18         Q    And it also required Nurse Smith to make

19    two visits a week; right?

20         A    A nurse, doctor.

21         Q    To provide a clinic; right?

22         A    Yes.

23         Q    And as far as Turn Key, Nurse Smith, their

24    staff, if there's a medical issue, the jail and the

25    jail employees rely on their professional opinion as

Charles Pearson                        September 15, 2018

```
                                              Page 160
 1    to what needs to be done, in this case, for Michael

 2    Smith; right?

 3         A    Correct.

 4         Q    The records show in this case that Michael

 5    Smith was seen by Turn Key employees five times in

 6    the 18 days he was in the jail, and are you aware of

 7    any time Turn Key staff telling your staff to send

 8    him to the hospital?

 9         A    Not to my knowledge.

10         Q    And when we've been talking about, oh, who

11    has the right to move Turn -- Michael Smith down to

12    115 or who doesn't have the right, do you remember

13    those questions?

14         A    Yes.

15         Q    So if Nurse Bilyeu says to staff, hey, I

16    think Mike -- Michael Smith needs to go down to 115,

17    they're going to follow that, aren't they?

18         A    I would expect them to, yes.

19              MR. HOWE:  Objection; form.

20         Q    (By Mr. Artus)  Because you rely on Turn

21    Key to tell you what to do; right?

22         A    Yes.

23         Q    As far as medical care goes; right?

24         A    Correct.

25         Q    And as far as a special treatment plan,
```

Charles Pearson                                    September 15, 2018

                                                        Page 161

 1   you know, he was talking about chronic care plans,

 2   do you remember that, you guys kind of got in a

 3   fight with each other, do you remember that?

 4        A    Yeah, I mean, that's kind of like out of

 5   my league, I think.

 6        Q    Well, I mean --

 7             MR. HOWE:  We fought for years.

 8             THE WITNESS:  Yeah, we have.

 9        Q    (By Mr. Artus)  A treatment plan is what

10   Turn Key says it needs to be; right?

11        A    Yeah.

12        Q    So if they say, hey, Michael Smith needs

13   to be down in 115, that's part of the plan; right?

14        A    Right.

15        Q    If they say, hey, he needs to be put on

16   these certain medications, that's part of the plan;

17   right?

18        A    Right.

19        Q    And if they say, hey, he needs his blood

20   pressure checked so many times or before he gives

21   this medicine or not -- or not taking this medicine,

22   that's the plan; right?

23        A    Right.

24        Q    Okay.  And then are you aware ever of

25   Nurse Smith or any complaints about Nurse Smith not

Charles Pearson                              September 15, 2018

```
                                              Page 165
  1      A    Right.

  2      Q    So it's done.

  3      A    I think there's another form out there

  4   somewhere, I don't know where.  All right.  I agree,

  5   yes.

  6      Q    Now, there's been testimony about, well,

  7   there's -- you don't -- you got -- you hire people

  8   to do their job; right?

  9      A    Right.

 10      Q    And -- and we hire Turn Key to do their

 11   job; right?

 12      A    Right.

 13      Q    And does that mean you have to hire

 14   somebody else to look at the person you hired to

 15   make sure they're doing their job?

 16      A    No.

 17      Q    And then you have to hire someone to look

 18   at that person to make sure they're doing their job?

 19      A    No.

 20      Q    But if somebody's not doing their job, an

 21   inmate can file a grievance; right?

 22      A    Right.

 23      Q    Now, while Michael Smith was in the jail

 24   during the relevant period, which was March 15th,

 25   2016, to April 2nd, 2016, did anybody ever complain
```

Charles Pearson                          September 15, 2018

                                                 Page 166

1    to you about the treatment he was receiving or that

2    he was receiving poor treatment?

3         A    No, no.

4         Q    Did any of his family members ever call

5    you?

6         A    I don't believe I received anything till

7    after he was already in the hospital and tort claim

8    was filed.  I can't remember.

9         Q    Let me ask you this, when the tort claim

10   was filed, was that the first time you ever knew of

11   any mistreatment claims?

12        A    Yes, yes, yeah.

13        Q    And by then, all the videos already

14   recorded over itself, hasn't it?

15             MR. HOWE:  Objection; form.

16             THE WITNESS:  Yes.

17        Q    (By Mr. Artus)  Okay.

18        A    We have a limited storage.

19        Q    It's against policy to let any inmate just

20   lay in their own feces or urine; right?

21        A    Absolutely.

22        Q    And it's against policy to not let an

23   inmate see medical if they're requesting it;

24   correct?

25        A    Correct.

Charles Pearson                                September 15, 2018

                                                    Page 167

1        Q    And in addition to the kiosk, people can
2    punch the intercom and request to see medical;
3    right?
4        A    Right.
5        Q    And in addition to pressing the button,
6    they can ask for a form to be put on sick call;
7    right?
8        A    Correct.
9        Q    And in addition to that, Turn Key has
10   somebody coming twice a day passing medicine; right?
11       A    Yes.
12       Q    And in this case, we know that Michael
13   Smith was seen twice a day by someone from Turn Key
14   medical staff giving his medicine?
15       A    Right.
16            MR. HOWE:  Objection; form.
17       Q    (By Mr. Artus)  So at any time he can
18   complain to them; right?
19       A    He also had employees bringing out
20   specialized food, I mean, there's so many other
21   things that go on here.
22       Q    But the policy is if anybody -- if anybody
23   disregarded his -- his -- knew that he had a medical
24   problem that needed immediate attention and they
25   disregarded it, that would be a violation of your

Charles Pearson                                September 15, 2018

Page 168

1    policy?

2         A     Absolutely.

3         Q     And you never became aware of that until

4    you got the notice of tort claim; is that correct?

5         A     That's correct.

6         Q     Or that allegation, anyway; right?

7         A     Allegation, yes.  Tort claim.

8               MR. HOWE:  Go off the record for a minute.

9               THE VIDEOGRAPHER:  Off the record.

10              (Discussion off the record)

11              THE VIDEOGRAPHER:  We are back on the

12   record.

13              MR. ARTUS:  Okay.  I'm going to pass the

14   witness.

15                    CROSS-EXAMINATION

16   BY MS. THOMPSON:

17        Q     I just have a few more questions for you,

18   Sheriff, so you can get out of here.

19        A     Okay.

20        Q     And just to remind you and everybody that

21   my name's Paulina Thompson, I represent Turn Key

22   Health Clinics, LLC, and you're still under oath.

23   If you have any questions or didn't understand my

24   question, please make sure to ask.  Okay?

25              So there's been some testimony that you

Charles Pearson                          September 15, 2018

```
                                              Page 169
 1    agree it's your responsibility to make sure that

 2    inmates receive adequate health care; correct?

 3         A    Correct.

 4         Q    So it would be up to you to make sure that

 5    the health care company or contractor continues to

 6    provide adequate medical care or they wouldn't be a

 7    contractor there anymore; correct?

 8         A    Correct.

 9         Q    And did you ever have an issue with Turn

10    Key not providing adequate medical care that you

11    know of?

12         A    No, ma'am, just complete the opposite.

13         Q    Have you ever observed or had knowledge of

14    any Turn Key employees mistreating or abusing

15    inmates?

16         A    No, ma'am.

17         Q    Failing to respond to inmates' medical

18    needs?

19         A    I'm just going to go on record and say

20    they exceeded my expectations.

21         Q    Thank you for saying that.  So as far as

22    you know, you do not -- you do not have any

23    knowledge of employees of Turn Key deliberately

24    ignoring medical needs of inmates?

25         A    Absolutely not.
```

Charles Pearson                          September 15, 2018

Page 172

1   personnel?

2        A    And also to see my employees and let them

3   know how much I appreciate what they're doing.

4        Q    During these visits, did you ever observe

5   Turn Key employees behave in any way that would lead

6   you to believe that they were ignoring medical needs

7   of --

8        A    No, ma'am.

9        Q    -- inmates?

10       A    I can't say anything bad, you know, it's

11  not really a long period of time that we were

12  together, but what -- it was obvious that the

13  complaints and things dramatically went down when

14  Turn Key come in.

15       Q    And --

16       A    For me.  I can't speak for Loyd and those

17  guys, but I can tell you my life got a lot better.

18       Q    Well, that's -- that's good.  So it sounds

19  like you don't have any personal knowledge as to how

20  Michael Smith was treated while he was there --

21       A    No, I don't.

22       Q    -- since you didn't see him?

23       A    I didn't.

24       Q    But did anybody complain to you regarding

25  his treatment this last time he was in jail that you

Charles Pearson                           September 15, 2018

                                               Page 175

1    of those cells, somebody would see it on the camera?

2         A    Yes.

3         Q    And during the med pass, were Turn Key

4    employees supposed to be accompanied by a jail

5    employee?

6         A    Yes.

7         Q    Was that for security reasons?

8         A    Policy.

9         Q    So --

10        A    No one goes into a cell block, even an

11   employee, by theirselves, not supposed to.  Not

12   saying they don't do it, because I've caught them,

13   you know.

14        Q    So for a Turn Key employee to go down

15   there without a jail staff or accompanying them --

16        A    That was against policy.

17        Q    -- that would be against policy?

18        A    It's against the jail standards, it's, you

19   know, it's just --

20        Q    Would you agree that most inmates that are

21   in jail do not want to be there?

22        A    Oh, no, some of them do.

23        Q    But most of them --

24        A    Just kidding, no, ma'am, no one wants to

25   be there.  I mean, it's just like nobody wants to be

Charles Pearson                              September 15, 2018

Page 177

1    if -- if we took every inmate said I need to go to

2    the hospital, there wouldn't have no inmates in

3    jail, I mean, nobody wants to be there, they need a

4    vacation, they need a break.  I'm not saying that

5    happened in Mike's case, I'm just saying that's

6    pretty common, you know, everybody that comes in the

7    jail, they want -- I'm this, I'm that, you know.

8        Q    So would you defer to a medical provider

9    to determine whether they actually have a medical

10   need?

11       A    That's the reason we started the triage so

12   we -- you know, if we could get some indicators

13   through blood pressure, you know, the initial exam,

14   that would give us an indication of -- because I

15   wanted to -- I always wanted to err on the side of

16   caution, I mean, if there was any doubt, let's take

17   them to the hospital.  And we would refuse them at

18   the door and make the arresting officer do it, you

19   know, and so that's -- that's one of the questions

20   that I had after the tort claim was filed, based on

21   what I had heard from the officers, or whatever was

22   said in something, I can't remember exactly what it

23   was, why he wasn't just sent on then, if he was

24   complaining from the moment of arrest, you know, but

25   those are just -- these are just speculations, it's

Charles Pearson                        September 15, 2018

Page 178

1   nothing I went right into, but it was a question I
2   think I asked Jeremy and I don't remember what his
3   response was then.
4        Q    Uh-huh.  So it sounds like in situations
5   like that, if, say, an inmate is asking for medical
6   assistance or to go to the hospital, whatever it may
7   be, you would defer to a Turn Key employee?
8        A    Yes.
9             MR. HOWE:  Objection; form.
10       Q    (By Ms. Thompson)  And that's because they
11  have the medical training and you don't; correct?
12       A    Right.  I mean, you know, I'd said in the
13  policy and things that when I was running it, you
14  know, it's -- you look at somebody and their pupils
15  are dilated or, you know, there's so many things
16  that you can miss and especially if you're not
17  trained and we're trying to fake our way through it,
18  and with the new drugs and the new things that are
19  going on, so Turn Key gave us another safety net
20  that I think probably saved a lot of lives, or saved
21  a lot of money as far as hospitalization, whether
22  through the taxpayers, through whatever system.
23       Q    With reference to the book-in sheet that
24  you and Lowell discussed earlier about the
25  signatures missing in that sheet, so in that booking