```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF OKLAHOMA

 3    MICHAEL EDWIN SMITH,              )
                                        )
 4                   Plaintiff,         )
                                        )
 5       -vs-                           )  No. 17-CV-90-RAW
                                        )
 6    BOARD OF COUNTY COMMISSIONERS, )
      MUSKOGEE COUNTY,                  )
 7                                      )
      ROB FRAZIER, SHERIFF OF          )
 8    MUSKOGEE COUNTY, in his          )
      official capacities,             )
 9                                      )
      TURNKEY HEALTH CLINICS, LLC,     )
10                                      )
      DOES II THROUGH XX,              )
11                                      )
                   Defendants.          )
12    _____)

13

14          DEPOSITION OF AMITY WILLIAMS, LPN

15         TAKEN ON BEHALF OF THE PLAINTIFF

16               ON AUGUST 21, 2018

17             IN MUSKOGEE, OKLAHOMA

18

19

20

21

22

23

24

25    REPORTED BY:  KIMI GEORGE, CSR, RMR
```

1     **Q.**    Do you recall whether a guard notified you

2     that he needed to be seen because of a medical

3     emergency?

4     **A.**    Yes.

5     **Q.**    Do you recall who that guard was?

6     **A.**    I do not.

7     **Q.**    Can you tell me, if I say -- Maybe you don't

8     know his name.  Do you remember the person's -- his

9     or her face or what they looked like?

10    **A.**    At that time?  No.  I -- Huh-uh.

11    **Q.**    I'm going to hand you a set of documents in

12    a minute.  These documents, to explain to you,

13    they're not in -- they're marked with a TK-006, is

14    the first page, and the last page is actually going

15    to be TK-23.  So, when you look through these, I

16    don't want you to think that these are in

17    chronological order from six, but they are actually

18    in an order I put them in, in terms of medical

19    records chronologically related to Michael Smith.

20    **A.**    Okay.

21    **Q.**    Does that make sense?

22    **A.**    Yes.

23    **Q.**    So I don't want that to cause any confusion.

24         When you first saw Michael Smith, where did

25    you physically see him?

Amity Williams, LPN
8/21/2018                                                                Page: 48

1            MR. HOWE:  Counsel, I'm going to turn to the

2     list of exhibits that we previously had handed out.

3     It's Exhibit 1, but it's TK-0004.

4     BY MR. HOWE:

5        Q.    Ms. Williams, I'm going to hand you this

6     document.

7        A.    Okay.

8        Q.    It's part of Exhibit 1, but it's TK-0004.

9     Do you recognize that document?

10       A.    Yep.  Yes.

11       Q.    Can you tell me and the jury what that

12    document is?

13       A.    It's a chest pain or indigestion protocol.

14       Q.    When you saw Michael Smith -- and I'm

15    talking about Michael Smith, the non-nurse, but my

16    client, who's now deceased.  When you saw him, what

17    were his complaints?

18       A.    He was complaining that his chest was

19    hurting.

20       Q.    Did he make any other complaints?

21       A.    No, sir, other than what I wrote down here,

22    that his feet was feeling numb.

23       Q.    Do you have any training and experience in

24    terms of determining the significance of a

25    patient who presents himself with numb feet?

1            MS. AH LOY:  Object to the form.  Go ahead.

2            MR. HOWE:  Well, I can -- I can -- I'll

3    rephrase that question because that's an important

4    question.  I want to make sure I understand I make

5    sure you understand my question.

6            THE WITNESS:  Uh-huh.

7    BY MR. HOWE:

8      Q.    Numb feet.  When you were treating Michael

9    Smith, was that an -- did that -- was that indicative

10   of any condition to you?

11     A.    No, sir.  Because he walked in there.

12     Q.    Well, I didn't ask you if -- if he walked in

13   there.  What I asked you, is that indic -- You would

14   agree with me that just because somebody has numb

15   feet that they can still walk?

16     A.    Yes.  Yes.

17     Q.    When a patient presents themself with numb

18   feet, what does that symptom suggest to you could be

19   wrong with them, based on your skills and experience

20   as a nurse?

21           MS. AH LOY:  I'm going to object to the

22   form.  You can go ahead and answer.

23           MR. HOWE:  I'm going to rephrase it one more

24   time.

25   BY MR. HOWE:

1    feet --

2        A.      No, sir.

3        Q.      -- being numb?  Now, hold on.  Hold on.

4        A.      That's why I wrote it down.

5        Q.      Okay.  Did -- Just we kinda talked over each

6    other there.  Did you understand my question?

7        A.      Yes, I understand.

8        Q.      Okay.  At the time that you treated Michael

9    Smith, after you see somebody for sick call --

10       A.      Uh-huh.

11       Q.      -- how do you determine whether there's

12   going to be continuing treatment or how you address

13   that issue?

14           MS. AH LOY:  I'm going to object to the

15   form, that that was a compound question.

16           MR. HOWE:  And I'll rephrase my question.

17   BY MR. HOWE:

18       Q.      When -- when you see a patient like Michael

19   Smith and he presents to you with the symptoms that

20   you say he had and the symptoms that you say he

21   had -- excuse me.  In your record that's before you,

22   it says, "Initial complaint: Chest pain."

23       A.      Yes.

24       Q.      It says, "History of hypertension."

25       A.      Yes.

```
 1    A.     Yes.

 2    Q.     How significant was that to you?

 3           MS. AH LOY:  Object to the form.

 4           MR. HOWE:  Well, I'll rephrase the question.

 5  BY MR. HOWE:

 6    Q.     How -- Based on the fact that he told you

 7  that, what did you do to help him?

 8    A.     I took his vitals and I notified the

 9  provider.

10    Q.     Which provider?

11    A.     Michael Smith, the nurse practitioner.

12    Q.     Sure.  And by the way -- Actually, I'll

13  withdraw that question.

14           When you notify a provider that a patient is

15  having chest pain laying down and the intensity is a

16  10, is that serious to you?  Do you take that as

17  serious?

18    A.     Yes.

19    Q.     Do you expect them to take that serious?

20    A.     I -- Yes.

21    Q.     In that condition, does that warrant a trip

22  to the hospital?

23    A.     Not necessarily.

24    Q.     But there are circumstances where it does --

25    A.     There are some -- yes.
```

1     Q.    Hold on a minute.  There are circumstances

2     where it does warrant a trip to the hospital.

3     A.    Yes.

4     Q.    So, how do you determine -- Do you have the

5     authority, in your position at this time with Turnkey

6     during the relevant period, to make the call that

7     Michael Smith go to the hospital?

8     A.    At the time, I have to notify the provider

9     and get an order to send him.  Now --

10    Q.    When --

11    A.    I'm sorry.

12    Q.    I'm sorry.  Go ahead.  You were going to say

13    something else.

14    A.    Now, if I absolutely thought it was

15    necessary, yes.  And I've done it before.  I will

16    send them out and then notify the provider.

17    Q.    So, generally speaking, in this case -- or

18    actually not generally speaking.  In this case, are

19    you saying it was not serious enough for you to

20    request that he be taken to the hospital without

21    notifying the provider?

22    A.    Right.

23    Q.    Why?

24    A.    Because his -- It was his blood pressure.

25    His blood pressure was extremely high, which can

1    cause the chest pain.  We do everything we can on

2    this protocol --

3        **Q.**    Uh-huh.

4        **A.**    -- and to get his blood pressure down.

5        **Q.**    Sure.

6        **A.**    Once his blood pressure was down, he was

7    relieved.

8        **Q.**    But when he was presenting with you on

9    March 18, 2016, with an intensity level of a 10 and

10   chest pain that happened when he was laying down and

11   still present, that's more serious than just saying,

12   "I have high blood pressure."  Would you agree with

13   me?

14           MS. AH LOY:  Object to the form.  You can

15   answer.

16       **Q.**    In this condition, wouldn't you agree with

17   me?  That's a very -- I'm not saying what you

18   necessarily are feeling, but if you're looking at not

19   only objectively but during your clinical

20   examination, it's important to take into

21   consideration subjectively what the patient is

22   telling you they are feeling.  In this case --

23       **A.**    No.

24       **Q.**    -- he's telling you it's a 10.

25       **A.**    Yes.

1          MS. AH LOY:  Object to the form.  And that

2    was, like, six questions together in one.

3      **Q.**    But in the case, you did not request that he

4    go to the hospital or seek an -- you, personally, did

5    not make the call that -- Let's put it this way.  You

6    did not make a decision on your own to send him to

7    the hospital.

8      **A.**    No.

9      **Q.**    You -- you felt that in this case, you

10   needed to notify the provider, who was Nurse Smith.

11     **A.**    Yes.

12     **Q.**    Do you know what Skype is?

13     **A.**    Yes.

14     **Q.**    What is Skype?

15     **A.**    It's, like, video over the computer.

16     **Q.**    Did Nurse Smith use Skype?

17         MS. AH LOY:  Object to the form.

18     **Q.**    Do you have knowledge of whether Nurse Smith

19   actually used Skype?

20     **A.**    No, sir, I don't.

21     **Q.**    You don't?

22         MS. AH LOY:  I have to object.  Do you mean

23   with the jail or on his own, personal time?

24         MR. HOWE:  I'm saying -- That's fair enough.

25   BY MR. HOWE:

1    you that?

2        A.    Yes.

3        Q.    Was that -- was the fact that he said he

4    hadn't had that pain before, did that affect the

5    way -- the treatment that you provided him on that

6    day?

7        A.    No, sir.

8        Q.    Well, what if he had said he had had the

9    pain before?  Would that have played a role in --

10       A.    No, sir.

11       Q.    It's okay.  Let me finish my question.

12   Would that have played a role in the treatment you

13   provided him that day?

14       A.    No, sir.

15       Q.    So, yes or no doesn't matter?

16       A.    No.

17       Q.    Why not?

18       A.    He didn't have no diaphoresis, no sweating.

19   He didn't have no radiation.  He didn't have any

20   other signs and symptoms but the chest pain.

21       Q.    When you say radiation, what are you

22   referring to?  No, no.  In your own words.  You said

23   he didn't have any radiation.  What does that mean?

24       A.    Means that it's not going down his arm to

25   his back, or he -- he didn't present any other signs

1    and symptoms of a heart attack.

2        Q.    So, when you were examining him, were you

3    thinking that he was at risk for a heart attack?

4        A.    Well, he was having chest pains.  That's

5    what this is for.

6        Q.    With a pain intensity of 10.

7        A.    Right.

8        Q.    So, as far as you knew in this condition,

9    with chest pain and a pain intensity of 10, he could

10   have had a heart attack and -- In order to send him

11   to the hospital, would he have had to have the heart

12   attack and drop and fall to the floor?

13           MS. AH LOY:  Object to the form.

14       Q.    What would it have taken him in this case

15   for you to make the call to send him to the hospital?

16       A.    It would have took what -- me doing

17   everything I could do --

18       Q.    Okay.

19       A.    -- and it still -- him presenting --

20   presenting the other symptoms, too.  I have -- you

21   know, I have people come in all the time, "I've hurt

22   my ankle.

23           "Well, what's your pain rate?

24           "It's a 10."

25           I understand what you're saying.  I'm just

1   saying I followed my protocol and I -- and he showed

2   no signs and symptoms of presenting a heart attack,

3   other than the high blood pressure.

4       Q.    In this situation, if we were to change one

5   fact, where he collapsed onto the floor and began to

6   suffer cardiac arrest, in that situation would you

7   have made the call to get him to the hospital?

8       A.    Yes.

9             MS. AH LOY:  Object to the form.  Answer

10  again so it's audible.  Sorry.

11      A.    Yes.

12      Q.    It also -- So, then we also see numb feet,

13  but that didn't -- that didn't mean anything to you

14  at that point?  Or let me ask you.  The numb feet,

15  did that affect your treatment of him on that day in

16  any way?

17      A.    No.

18      Q.    Ms. Williams --

19      A.    Well, I --

20      Q.    -- there's -- That's okay.  I'm going to

21  explain something to you.  Are you aware that Michael

22  Smith suffered from Stage IV metastatic cancer to the

23  bone at the time that he was brought into the county

24  jail?

25            MS. AH LOY:  I'm going to object, inasmuch

1             MS. AH LOY:  Object to the form.

2      Q.    Would you want to know that?

3      A.    Yes.

4      Q.    Because, Ms. Williams, I'm not sitting here

5   today thinking you're a bad person.  I believe that

6   it's your desire to provide the best level of patient

7   care you can, right?

8             MS. AH LOY:  I'm going to have to object,

9   unless you're willing to stipulate to that fact.

10             MR. HOWE:  Stipulate to what?

11             MS. AH LOY:  That she is trying her best and

12   it is her intent to provide the best care possible.

13             MR. HOWE:  Well --

14             MS. AH LOY:  Because it's an improper

15   question, unless you are willing to stipulate to it,

16   then I'll allow it.

17             MR. HOWE:  Well, this is the fun lawyer

18   stuff, so don't worry about it.  We'll be fine after

19   the deposition, promise you.

20   BY MR. HOWE:

21      Q.    And also when he presented -- and where it

22   says at the bottom here, 106/56 on your record --

23      A.    Uh-huh.

24      Q.    -- what is that referring to?

25      A.    That's his blood pressure --

```
 1        Q.     What is -- Go ahead.

 2        A.     -- after the clonidine.

 3        Q.     After the clonidine?

 4        A.     Yes.

 5        Q.     When you saw him, can you tell me exact --

 6    I want to make sure I didn't overlook this.  When you

 7    treated him, what, exactly, did you do for him?

 8        A.    I checked his vitals.  His blood pressure

 9    was up, as you can -- I notified the provider --

10        Q.     Nurse Smith?

11        A.     -- Nurse Smith, and he gave me the orders to

12    give the clonidine, and that's exactly what I did.

13        Q.     How -- for members of the jury and myself,

14    how is clonidine administered?

15        A.     Orally.

16        Q.     Orally?

17        A.     Yes.

18        Q.     Is it a pill?

19        A.     Yes.

20        Q.     So, when he was there, did you take his

21    blood pressure before you gave him a clonidine?

22        A.     Yes.

23        Q.     On this record, is it noted what his blood

24    pressure was before the clonidine?

25        A.     No, but it is on my order that I wrote.
```

1      **Q.**   So, in order to understand your order where

2   it says blood pressure, 134/10 -- I'm going to take

3   you to your next page -- the next page.

4           MS. AH LOY:  She doesn't have it.

5      **A.**   I don't have it.

6           MS. AH LOY:  You only gave her one page.

7      **Q.**   Okay.  Ms. Williams, I'm going to hand you a

8   document which is part of Exhibit 1, but it's also

9   marked as TK-019.  Does that document include your

10  writing?

11     **A.**   Yes.

12     **Q.**   Can you tell me which writing is yours?

13     **A.**   The top writing.

14     **Q.**   So, when you say the top writing, are you

15  referring to there's -- this is -- It states,

16  "Provider Orders," and it's sectioned off to where it

17  says, "Date," Time," and the first entry is March 18,

18  2016, and it says, "1 times clonidine, O.1

19  milligrams."

20     **A.**   Yes.

21     **Q.**   Is that the dose of clonidine that you gave

22  Mr. Smith?

23     **A.**   Yes.

24     **Q.**   Then where it says, "Blood pressure --"

25           Or what does BP mean?

1      A.     BP, blood pressure.

2      Q.     What are your -- What do those numbers say

3   right there?

4      A.     134/107.

5      Q.     That's referring to his blood pressure --

6      A.     His blood pressure.

7      Q.     -- reading --

8      A.     Yes.

9      Q.     Where it says "P 70" --

10     A.     Yes.

11     Q.     -- what is that referring to?

12     A.     That's his pulse rate.

13     Q.     And then off to where it says, "Noted by" --

14     A.     Yes.

15     Q.     -- is that your signature?

16     A.     Yes.

17     Q.     And then what are those initials next to it?

18     A.     LPN.

19     Q.     Is that referring to your job title as a

20   licensed -- Is it licensed practical nurse?

21     A.     Yes.

22     Q.     And then under that, it says, "3 --" Does

23   that -- what does that say?

24     A.     3-18-16, at 0930.

25     Q.     What does 0930 refer to?

1    writing?  I'm sorry.  The second column where it

2    says, "#1 lisinopril."

3        A.    No, it's not.

4        Q.    Who is that?  Do you know whose writing that

5    is?

6        A.    I do not.

7        Q.    When you contacted Michael -- Nurse Smith,

8    when you -- on March 18, 2016, did you ask him

9    whether Michael Smith -- whether you should do

10   anything else to Michael Smith in terms of treatment?

11       A.    I don't recall what I asked him, honestly.

12       Q.    Well, do you recall whether you told him

13   that this was a serious or non-serious matter --

14            MS. AH LOY:  Object to the form.

15       Q.    -- the symptoms that Michael Smith, my

16   client, was being treated for were serious?

17       A.    I don't recall.  All I -- I know that I --

18   everything I wrote down, I told -- I explained to

19   him.

20       Q.    Did you tell him you thought he needed to go

21   to the hospital?

22       A.    I don't recall that.  I know he was -- I was

23   told to put him in to see the provider.

24       Q.    Well, when you say you were told to put him

25   in to see the provider, what you're saying is, Did

1   you pers -- I want to make sure I understand.  Did

2   you personally call Michael Smith, Nurse -- Nurse

3   Smith?  Did you do that after this examination --

4       A.    I did it during --

5       Q.    -- and looking at your notes?

6       A.    -- this examination.

7       Q.    And his response was to put him on -- What

8   are you calling it?

9       A.    The provider list.  He would see him.

10      Q.    So, March 8th, 2016, being on a Tuesday --

11            MS. AH LOY:  I'm going to have to object.

12  It's March 18th.

13            MR. HOWE:  Thank you.  Thanks for doing

14  that.

15  BY MR. HOWE:

16      Q.    March 18th was on a Friday.  Did -- did

17  Nurse Smith tell you when he would be back in to

18  treat patients that were on the sick call list?

19      A.    Not that I recall, no.

20      Q.    Did you know when he was going to be back in

21  to treat patients on the sick call list?

22      A.    Honestly, I can't remember.

23            MR. HOWE:  And -- and that's fair.  I don't

24  want you to guess.  We'll go off the record, take a

25  break to change the tape.

1    saying that there's a closed --

2            Do you know what the term CCTV means?

3        **A.**    No.

4        **Q.**    Okay.  Closed circuit television or closed

5    circuit recording, what it means is, it's a -- it's a

6    recording from a surveillance system that is

7    monitored by an outside source, but it's just limited

8    to the outside source.  So, say, for example, you

9    have a jail that's direct with a camera, what's

10   called a camera --

11       **A.**    Yes.

12       **Q.**    -- that's able to record what is going on in

13   that section of whatever -- in that area, so in this

14   case, the isolation cell --

15       **A.**    Uh-huh.

16       **Q.**    -- and then the feed of that recording, or

17   where that information is being displayed, is being

18   sent to another area within the jail where somebody

19   else can observe and watch what's happening.

20       **A.**    Yes.

21       **Q.**    To your knowledge, was Michael Smith -- did

22   he make any threats that he was going to hurt

23   another -- another patient or inmate?

24       **A.**    He made threats that he would throw hisself

25   down the stairs.  That's one reason why he was moved

1   down for his safety.

2        Q.    Oh, he personally told you that he was --

3        A.    Yes.

4        Q.    -- going to throw himself down the stairs?

5        A.    That was one of the reasons why he was moved

6   down on -- I don't know what day it was when he

7   was -- not this day, but the next day he was seen,

8   he -- he --

9        Q.    He was seen by you?

10       A.    No.

11       Q.    Who was he seen by?

12       A.    When he was seen by Cindy.

13       Q.    But were you present during that examination

14  when he said that?

15       A.    I was standing there, yes.

16       Q.    You were standing there.

17       A.    Yes.

18       Q.    What is the reason why he told you that he

19  would throw himself down the stairs?

20       A.    Because he wanted to go to the hospital.

21       Q.    When he was moved to detox, or this

22  isolation section --

23       A.    Uh-huh.

24       Q.    -- of the jail, who made that decision?

25       A.    Cindy.  We had him moved for his safety down

1    there.  She made the decision and had them move him

2    down there so he can be watched and observed.

3        Q.    From the time he was -- and I'm going to

4    turn your attention -- Have you ever seen, prior to

5    today, the medical record -- any of the other medical

6    records prepared by the nursing staff in this case

7    other than your own records?

8        A.    No, just whatever -- No.  If it was in his

9    file, no.

10       Q.    Well, when you say his file, what are you

11   talking about?

12       A.    Well, it would be like this (indicating).

13   We had a file everything went into, his own thing.

14       Q.    Before you came here today, have you talked

15   to -- other than your attorney, Ms. Ah Loy, have you

16   talked to anyone else -- hold on a minute -- about

17   your deposition today?

18       A.    No, sir.

19       Q.    You didn't contact any of the other nurses?

20       A.    No, sir.

21       Q.    Did you review any documents?

22       A.    No, sir.

23       Q.    No?  So, as we sit here today, have you ever

24   seen the medical progress note form dated March 25th

25   of 2016 that was filled out by Cindy Bilyeu?

```
 1      A.    No, sir.

 2      Q.    But you're saying that you were present

 3  during the examination that we're referring to?

 4      A.    Yes.

 5      Q.    Is it the examination on March 25th, 2016?

 6      A.    I don't know what date it was.

 7      Q.    Well, if that --

 8      A.    He was --

 9      Q.    Sure.

10      A.    He was brought down to see me, and Cindy

11  happened to be there that day, so Cindy went ahead

12  and seen him.

13      Q.    Do you remember who brought him to you?

14      A.    I do not.

15      Q.    Was it Justin Hunnicutt?  Does that refresh

16  your memory?

17      A.    I do not -- I honestly do not know who the

18  guard was.

19      Q.    And that's okay if you don't know.  What was

20  the reason why that guard brought him to you?

21      A.    I honestly don't really remember why he was

22  going to be seen that day.

23      Q.    It was serious enough to where his name

24  wasn't put in the kiosk for sick call, to where a

25  guard felt it was a imminent situation where he had
```

1      A.    For certain --

2      Q.    Uh-huh.

3      A.    -- that I recall?  No.

4      Q.    Can you tell -- can you tell me for certain

5  whether Nurse Bilyeu asked you any questions about

6  your previous visit or -- with Michael Smith?

7      A.    Not that I can recall, no.

8      Q.    So, is it possible that she didn't ask you

9  about your previous examination of Michael Smith on

10  March 18th?

11      A.    It's possible she did.  It's possible she

12  didn't.  I don't really remember.

13      Q.    After Michael Smith was sent to an isolation

14  cell while you were on --

15            When somebody is sent to an isolation

16  cell to be -- what was it, from -- either a threat to

17  themselves, a threat to an inmate or there's -- what

18  do you call it, a situation in which they need to be

19  visibly observed?

20      A.    Medical observation, mental health

21  observation.

22      Q.    So, in this case, are you saying that he was

23  sent -- Who decided -- I'm going to withdraw that

24  question.

25            Who made the decision that my client,

1  Michael Smith, be sent to an isolation cell?

2      A.    Cindy said he needed to go down, and tell

3  the guards it's for his safety and so we could

4  monitor him.

5      Q.    So, when Michael Smith was in isolation from

6  March 25th, 2016 --

7      A.    Uh-huh.

8      Q.    -- until he was released on April 2nd, 2016,

9  did you monitor him?

10     A.    What -- From when he was downstairs?

11     Q.    Yes, ma'am.

12     A.    No.  That he is monitored by the video.  If

13  anything was to go on, they would notify us.

14     Q.    And when you say they, who -- who's

15  respon --

16     A.    The --

17     Q.    Hold on a minute.  Who is they?  Who is

18  responsible for monitoring a patient in isolation?

19     A.    Whoever's on main control at the time.

20     Q.    Is that Turnkey staff or is that county jail

21  staff?

22     A.    That's jail staff.

23     Q.    So when a patient, as in this case, Michael

24  Smith, is sent to isolation for medical observation,

25  the jail is the one who monitors them?

1      Q.    Do you recall the very first time you gave

2  Michael Smith his meds?

3      A.    It would have been this day, is the first

4  time I gave him meds.

5      Q.    Was he walking then?

6      A.    Yes.

7      Q.    That was on March 18th?

8      A.    Yes.

9      Q.    Do you recall the other days after

10  March 18th when you would do your med pass before he

11  was sent into isolation, of how you would give him

12  his meds, other -- Well, let me -- let me withdraw

13  that question because there was a lot in there.

14          Do you recall, from the time you saw Michael

15  Smith on March 18th of 2016, how many times -- or you

16  passed med -- you -- he came downstairs for his meds

17  when he was still walking?

18      A.    I do not.

19      Q.    Do you remember whether Michael was

20  experiencing -- Oh, no, I'm sorry.  This is --

21  Withdraw that question.  I had "BPV," but it's "BP

22  checks," like blood pressure checks, not benign

23  position vertigo, right?  Okay.

24          Do you re -- Did it ever -- Did anybody ever

25  notify you, from March 1st -- or from March 15, 2016,

Amity Williams, LPN
8/21/2018                                                        Page: 123

1       A.      No.

2       Q.      Can you prescribe medication?

3       A.      No.

4       Q.      Can you make diagnoses?

5       A.      No.

6       Q.      Did you believe at any time while Michael

7   Smith was under your care that he had a serious

8   medical condition that required immediate

9   transportation to a hospital?

10      A.      No.

11      Q.      Did you ever refuse to provide medical care

12  and treatment to Michael Smith?

13      A.      No.

14      Q.      Did you witness any other Turnkey provider

15  refuse to provide medical care and treatment to

16  Michael Smith?

17      A.      No.

18      Q.      Do you have any reason to believe that any

19  Turnkey provider denied care and treatment to Michael

20  Smith?

21      A.      No.

22      Q.      Was Turnkey's policy to provide medical care

23  to inmates?

24      A.      Yes.

25      Q.      Did Turnkey have any policy that told you to