Michael Scott Smith, APRN
8/18/2018

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

MICHAEL EDWIN SMITH,            )
individual,                     )
                                )
      Plaintiff,                )
                                )
-vs-                            ) No. 17-CV-90 RAW
                                )
BOARD OF COUNTY COMMISSIONERS,)
MUSKOGEE COUNTY;                )
                                )
ROB FRAZIER, SHERIFF OF         )
MUSKOGEE COUNTY, in his         )
Official Capacities;            )
                                )
TURNKEY HEALTH CLINICS, LLC,    )
                                )
DOES II through XX,             )
                                )
      Defendants.               )


     VIDEOTAPED DEPOSITION OF MICHAEL SCOTT SMITH, APRN


          TAKEN ON BEHALF OF THE PLAINTIFF


               IN MUSKOGEE, OKLAHOMA


               ON AUGUST 18, 2018


          COMMENCING AT 8:20 A.M.



               INSTASCRIPT, LLC
          101 PARK AVENUE, SUITE 910
          OKLAHOMA CITY, OKLAHOMA 73102
               (405) 605-6880
               www.instascript.net
     REPORTED BY: CYNDI WHITE LARIMER, CSR

EXHIBIT
4

Michael Scott Smith, APRN
8/18/2018

Page 29

1   relevance of any of them.  Maybe we need to chat later

2   about that.  I'll go look at your discovery requests and

3   then we'll chat.

4           MR. HOWE:  Yeah.  That would be fine.  Just

5   rather than continuing to ask him and try to guess how

6   much he makes.  If he's got a vow of poverty, I don't

7   want to go into that with him.

8           MS. AH LOY:  And I don't want to argue on the

9   record, but I don't know what his salary would have --

10  what bearing it would have on any of the issues in -- we

11  can discuss this off the record later.

12          MR. HOWE:  Sure.

13  **Q**   (By Mr. Howe) When you would do your sick call

14  visits -- you said you would do them two times a week --

15  **A**   Two days out of the week.  Yes, sir.

16  **Q**   What two days would you do them out of the some week

17  while you were an employee with Turn Key?

18  **A**   With Turn Key, as best as I can recollect, it was on

19  Monday and Thursdays.

20  **Q**   Were there certain hours?

21  **A**   Usually I would finish up with my own clinic

22  generally around 4:00 p.m. to 4:30 and then report to the

23  jail.

24  **Q**   And then how long would you be at the jail for?

25  **A**   Until I completed my duties there.

Michael Scott Smith, APRN
8/18/2018

1  **Q**    Generally, if you got to the jail at about 4:30,

2  when would you generally complete all your duties?

3  **A**    About three hours.

4  **Q**    So about 7:30, 8:00?

5  **A**    7:30ish.  And that is still the case.

6  **Q**    When you say "sick call," I have an understanding of

7  what that is, but for members of the jury who don't know,

8  explain to me what sick call is.

9  **A**    It is any individual who has a complaint that is

10 serious enough to require, in their estimation, that they

11 need to seek treatment.

12 **Q**    Okay.  How do inmates provide notice that they need

13 to be seen?

14 **A**    Currently, there is what's called a kiosk.  They can

15 communicate electronically, or I believe at that time

16 they could also do it written or even verbal.

17 **Q**    Going back to -- what we want to do is we want to

18 narrow down to a window of time from what I believe

19 are -- what the relevant dates are in this case from

20 March 15, 2016, to April 2nd, 2016.

21 **A**    Uh-huh.

22 **Q**    Do you recall how inmates were able to request -- or

23 how you would know to provide --

24 **A**    I don't.

25 **Q**    -- medical services?

Michael Scott Smith, APRN
8/18/2018

Page 39

1   **A**    I do.

2   **Q**    What is the first memory that you have of Michael?

3   **A**    I visited with him physically.

4   **Q**    And just without looking at your notes.  I mean,

5   I'll let you refer to your notes.  I'm just saying,

6   with -- in your mind, I want to make sure that I know

7   you're talking about the same person.

8       What do you remember about Michael when you first

9   came in contact with him or can you describe what he

10  looked like?

11  **A**    He was an African-American gentleman, approximately

12  50 years of age.

13  **Q**    And where did you first come into contact with him?

14  **A**    At the Muskogee County detention facility.

15  **Q**    Where in the facility?

16  **A**    In the medical section.

17  **Q**    When you say "the medical section," are you

18  saying -- is it a medical exam room?

19  **A**    It is.

20  **Q**    Do you recall the reason why you went to go see

21  Michael Smith?

22  **A**    Yes.

23  **Q**    What is the reason why?

24  **A**    He had complained of elevated blood pressure and

25  back pain.

Michael Scott Smith, APRN
8/18/2018

Page 42

```
 1   A     No.

 2   Q     So you wouldn't know that person by name?

 3   A     No.  Nor by sight.

 4   Q     Fair enough.  Do you -- when you -- strike that.

 5         When Michael Smith was brought to you, you said he

 6   was brought to you by a runner.  Do you know whose

 7   request that was at?

 8   A     I believe it was Michael's.

 9   Q     Do you know why Michael requested to see you?

10   A     He had two complaints.  The first was elevated blood

11   pressure.  The second was back pain.

12   Q     When you saw Michael, was -- you say it was because

13   of elevated blood pressure.  But did Michael say he

14   wanted to see you because he had high blood pressure, or

15   was it because somebody in the jail examined him before

16   he got to you?

17   A     Both.

18   Q     -- and then -- hold on a minute.

19   A     Okay.

20   Q     -- and then decided that he needed to see you

21   because during the exam they determined he had high blood

22   pressure?

23   A     Michael was very concerned about blood pressure and

24   his heart, by his own admission, as well as back pain.

25   He had a documented history, even on the outside, prior
```

Michael Scott Smith, APRN
8/18/2018

Page 44

```
 1   about his heart and also he was complaining of back pain.
 2   Do you recall just testifying to that?
 3   A    Yes, sir.
 4   Q    When you were notified of that and you examined him,
 5   did you then engage in any action to determine what his
 6   medical history was?
 7   A    Yes, sir.
 8   Q    Okay.  Who did you contact?
 9   A    I contacted two people.  I contacted his cancer
10   doctor, Dr. Eckenrode, and I contacted his urologist,
11   Dr. Gaillich.
12   Q    How did you know to contact Dr. Eckenrode?
13   A    He told me.
14   Q    "He" being Michael?
15   A    Michael encouraged me to contact them.
16   Q    Why did he encourage you to contact his cancer
17   doctor?
18   A    Because he felt that that would give a better
19   picture of his medical condition.
20   Q    And did he also tell you to contact Dr.  -- is it
21   Gaillich?
22   A    Yes.
23   Q    And you contacted Dr. Gaillich too?
24   A    Both -- yes, sir.  Both the urologist, Dr. Gaillich,
25   as well as Dr. Eckenrode.
```

Michael Scott Smith, APRN
8/18/2018

Page 48

1  **Q**    In the bottom right-hand corner, it says 3/16/16 and

2  then it has initials.  Are those your initials?

3  **A**    Those are my initials, yes, sir.

4  **Q**    So where did these -- I'm trying to figure out where

5  did you physically receive these documents?

6  **A**    At my office.  My private office.

7  **Q**    And you initialed them?

8  **A**    I did.

9  **Q**    So does --

10  **A**    Which means I reviewed them.

11  **Q**    Does that mean that you reviewed them on March 15th,

12  2016?

13  **A**    Yes, sir.

14  **Q**    In reviewing these documents, the record that I want

15  to turn your attention to on TK006, the first page, these

16  documents, did they provide you knowledge that John

17  Eckenrode was Michael Smith's oncologist?

18  **A**    Well, it was only one visit.

19  **Q**    I didn't ask that question.  I said in -- so I just

20  want to make sure you answer -- or I ask a good question

21  so you can answer it.  And maybe my question was unclear,

22  so let me try this again.

23  **A**    Uh-huh.

24  **Q**    The records that we're referring to, that are

25  Bates-stamped 6, 7 -- 6 through 11, these are records you

Michael Scott Smith, APRN
8/18/2018

Page 49

1   received on March 15, 2016, and reviewed; correct?

2   **A**   Yes, sir.

3   **Q**   And the first record that we see is it's a record of

4   John -- from provider John Eckenrode.

5   **A**   Uh-huh.

6           MS. AH LOY:  Is that a yes?

7           THE WITNESS:  Yes.  Thank you.

8   **Q**   (By Mr. Howe) And it says that Michael Smith was

9   diagnosed with prostate cancer metastatic to bone.  Did

10  you have that knowledge?

11  **A**   Yes, sir.

12  **Q**   Have you reviewed that?

13      Also from this record, were you able to determine

14  that Michael was diagnosed in 2012 at OSU and was

15  metastatic?

16  **A**   Yes, sir.  Stage 4.  There's no cure.

17  **Q**   It also says in those records he was radiated twice,

18  apparently once to his spine, the T11, thoracic 11

19  vertebra --

20  **A**   Uh-huh.

21  **Q**   -- and also his pelvis; correct?

22  **A**   Correct.

23  **Q**   And it also stated that he sees a pain specialist

24  for his cancer pain; correct?

25  **A**   Correct.

Michael Scott Smith, APRN
8/18/2018

1   Q    And it also states that -- and this is a record from

2   February 8th, 2016, of John -- from John Eckenrode, but

3   it also states that his PSA was about a 5.

4   A    Five.

5   Q    I'm not an oncologist.

6   A    Uh-huh.

7   Q    Are you familiar with what a PSA of 5 means?

8   A    What it is, a PSA is a prostate specific antigen.

9   It is a screening test, first of all, that is imprecise.

10  The upper level of normalcy would be considered 4.  In a

11  person with documented prostatic cancer, it would not be

12  unusual to have it even slightly higher than 4.  It can

13  go much, much higher.

14       But, again, I too am not an oncologist.

15  Q    When you reviewed this first page, 6, it was

16  apparent to you that Michael had serious medical health

17  issues?

18  A    That were not curable.

19       MS. AH LOY:  Object to the form.  Sorry.

20  Q    (By Mr. Howe) Okay.  Based on this record, were you

21  able to determine whether Michael Smith had a serious

22  medical issue?

23  A    Yes.

24  Q    On page 2 of this record, if you'll turn the page --

25  it says number 7 -- it also states that Michael Smith was

Michael Scott Smith, APRN
8/18/2018

Page 51

```
 1   receiving leuprolide acetate injections.  Is that an
 2   injection?
 3   A    It is.
 4   Q    And what is that injection for?  What does it treat?
 5   A    It treats advanced prostate cancer.  It is designed
 6   to, essentially, block androgen.
 7   Q    So that's a cancer medication?
 8   A    It's a cancer medication but it is not a curing
 9   medication.
10   Q    Yeah.  But Dr. Smith, you continue to --
11   A    Nurse Practitioner Smith.
12   Q    I thank you for saying that.
13   A    Yes.
14   Q    Nurse Smith -- Nurse Practitioner Smith --
15   A    Yes, sir.
16   Q    If I say nurse, is that fine or do you want --
17   A    That's fine.
18   Q    Just not doctor.
19   A    No.  No.
20   Q    Okay.  I agree.
21        Okay.  So, Nurse Smith, my question, though, I'm not
22   asking you if Michael Smith's cancer was curable.
23   A    Yes.
24   Q    My question is he was at a progressive stage of
25   cancer and it was apparent that he was also actively
```

Michael Scott Smith, APRN
8/18/2018

Page 52

```
 1  receiving cancer medication and injections as of February
 2  of 2016; correct?
 3  A    Correct.
 4           MS. AH LOY:  Object to the form.
 5           THE WITNESS:  Oh.
 6           MS. AH LOY:  Sorry.  Go ahead.
 7  Q    (By Mr. Howe) Then as we turn the page --
 8  A    Oh, wait, wait, wait.  His next lupon injection was
 9  not due for some time.
10  Q    Sir --
11  A    In six months.
12  Q    -- I ask the questions.
13           MR. ARTUS:  I think he has a right to clarify.
14           MR. HOWE:  No, he doesn't.
15           MS. AH LOY:  He has a right to fully answer
16  your questions.
17           MR. HOWE:  He did answer it, didn't he?
18           THE WITNESS:  No, no, no.
19           MS. AH LOY:  No.  He was clarifying his answer
20  right there.
21           MR. ARTUS:  Well, I think you were implying
22  that he had these shots that were regularly needed and in
23  fact the shots were given every six months and he was
24  clarifying that the next one was in May.
25           THE WITNESS:  He was not due for the next shot
```

Michael Scott Smith, APRN
8/18/2018

Page 53

```
 1    until actually December -- I'm sorry -- yeah.  He
 2    received it December 10th.  He would not be due again
 3    until June the 10th.
 4            MR. HOWE:  Okay.  Again, I don't think that was
 5    in response to my question.  I'd move to strike as
 6    nonresponsive.
 7    Q    (By Mr. Howe) However, I'll ask you my next
 8    question.  And again, I appreciate you taking a pause
 9    while the lawyers --
10    A    Sure.
11    Q    -- talk that out.
12         Now, as I take you to page 9, which is two pages
13    after, in reviewing this record, was it clear to you that
14    Michael Smith was diagnosed with prostate cancer
15    metastatic to the bone?
16    A    Yes, sir.
17    Q    Was it also clear to you that a whole body scan was
18    being ordered on -- as a result of this encounter?
19    A    It had already been completed.
20    Q    Well, the body scan actually happened after.
21         I mean, we'll get to that.  But was it -- where it
22    says assessment plan on this record, in reading this
23    record, was it your understanding that a body -- on page
24    10 -- that a body scan -- excuse me -- an NM bone scan,
25    what does that mean?
```

Michael Scott Smith, APRN
8/18/2018

Page 54

1   **A**    What it is is an entire body scan in which a

2   radioisotope is injected, you wait a period of time and

3   the entire body is scanned.  And it can pick up what we

4   refer to commonly as hotspots or evidence of metastasis.

5   And that was reviewed.

6   **Q**    And according to this record --

7   **A**    Uh-huh.

8   **Q**    -- was it also -- on page 10 it also states that he

9   was to return in about three months from February 8th;

10  correct?

11  **A**    Correct.

12  **Q**    So that would mean that he would have been -- he was

13  supposed to go back and see -- let me ask you this:

14  Based on that, did you have reason to believe he was

15  supposed to go back and see his oncologist on May 8th of

16  2016?

17  **A**    When I contacted both medical offices, they were

18  very consistent in Mr. Smith's noncompliance with medical

19  directions.

20  **Q**    Okay.  Well, that's what I have some questions

21  about.  I didn't ask you that question.

22  **A**    Uh-huh.

23  **Q**    But what I want to know is:  In reviewing this

24  record that I'm referring to, how does it show that

25  Mr. Smith was noncompliant?  What was he doing, in your

Michael Scott Smith, APRN
8/18/2018

Page 55

1   opinion, or that -- Or let me ask you this:  Who told you

2   that Mr. Smith was noncompliant in his medical treatment?

3   **A**    Both Dr. Gaillich and Dr. Eckenrode.

4   **Q**   What was Michael supposed that do that Dr. Eckenrode

5   said he wasn't doing?

6   **A**    It was his impression that Michael was more

7   interested in obtaining certain controlled medicines than

8   any actual treatment.

9   **Q**    Well, I didn't ask -- that's speculating on what he

10  knows.  His impression -- are you saying it was his

11  medical opinion --

12          MR. ARTUS:  Now, wait a minute.  Objection.

13  You did ask him and he answered.

14          MR. HOWE:  He said impression.  I don't --

15  impression, if it's my impression.

16          THE WITNESS:  Uh-huh.

17  **Q**   (By Mr. Howe) Okay.  I'm asking --

18  **A**    He told me.

19  **Q**    Okay.  But when you -- when people in the health

20  profession use the word "impression," that may mean

21  something different.  So when you say impression, are you

22  saying it was his opinion?

23          MS. AH LOY:  Object to the form.

24  **Q**   (By Mr. Howe) Well, I don't know what impression

25  means.  Can you say another --

Michael Scott Smith, APRN
8/18/2018

Page 56

```
 1              MS. AH LOY:  Object to the form.
 2              MR. ARTUS:  He just clarified that.
 3              MR. HOWE:  Well, okay.  Well --
 4              MR. ARTUS:  He said he told him that.
 5              MR. HOWE:  That's not a proper objection.
 6   Q   (By Mr. Howe) I don't know what impression means.
 7   When I read a medical record, it says impression or plan.
 8   What does impression mean?
 9              MR. ARTUS:  Objection.  Asked and answered.
10   Q   (By Mr. Howe) Well, answer it, please, because I
11   still don't know what impression means.  What does that
12   mean, it's his impression?  When the doctor says, "It's
13   my impression," what is another word for impression?
14   Because I don't understand what that means.
15              MS. AH LOY:  Object to the form.
16              You can answer if you can.
17   Q   (By Mr. Howe) Yeah.  It's just going to help me gain
18   clarity.
19   A   It was his opinion that Michael was not serious
20   about seeking actual treatment.
21   Q   What exactly, other than his impression that Michael
22   wanted pain meds and didn't want his cancer treated --
23   you said he wanted narcotic pain meds -- what was --
24   A   I did not say narcotic pain meds.
25   Q   Okay.
```

Michael Scott Smith, APRN
8/18/2018

Page 57

1    **A**    I said controlled substances.

2    **Q**    Well, is that a narcotic pain med like hydrocodone?

3    **A**    It was -- with Dr. Eckenrode, I believe it was

4    Xanax.

5    **Q**    Okay.  So what was Michael doing that was

6    noncompliant to his cancer treatment?  Did Dr. Eckenrode

7    tell you that?

8    **A**    No.

9    **Q**    But it's your testimony that Dr. Eckenrode told you

10   that Michael was noncompliant with his cancer treatment?

11   **A**    Yes.  With following up.

12           Well, that's actually Dr. Gaillich's office.

13   **Q**    Dr. Gaillich --

14   **A**    He only had one visit, I believe, with

15   Dr. Eckenrode.

16   **Q**    But Dr. Gaillich is the urologist.

17   **A**    Correct.

18   **Q**    Dr. Eckenrode is the oncologist.

19           So did Dr. Eckenrode say anything to you, to the

20   best you can recall, that Michael was noncompliant with

21   his cancer treatment?

22   **A**    He believed he was more interested in obtaining

23   Xanax.

24   **Q**    That's what Dr. Eckenrode said?

25   **A**    Uh-huh.

Michael Scott Smith, APRN
8/18/2018

Page 58

1    Q    Did he say anything else?

2    A    No.

3    Q    Okay.  Now let's go to Dr. Gaillich.

4    A    Except I don't believe he really regarded him as his

5    patient when he I think saw him only the one time.

6    Q    Well, are you just guessing on that?  Can you say

7    that for certain?

8    A    No.

9    Q    What about Dr. Gaillich?

10   A    That was -- I believe Michael had actually started

11   treatment with Dr. Gaillich and then Dr. Gaillich

12   referred Michael to Dr. Eckenrode.

13   Q    Okay.  What was Dr. Gaillich saying Michael was

14   noncompliant about?

15   A    Following up on appointments.

16   Q    Did he tell you that he had missed a recent

17   appointment?

18   A    No.

19   Q    How was how long was the conversation that you had

20   with Dr. Eckenrode?

21   A    Oh, probably three to five minutes.

22   Q    It was a phone conversation?

23   A    It was a phone conversation.

24   Q    Did you request any additional records to determine

25   what this alleged noncompliance was?

Michael Scott Smith, APRN
8/18/2018

Page 59

```
 1   A     No.  No.
 2   Q     What about Dr. Gaillich?  Did you speak to him
 3   personally on the phone?
 4   A     It was either himself or one of his assistants.  I'm
 5   not sure who.
 6   Q     Well, do you know if it a receptionist or --
 7   A     Oh, no.  No.  It was a provider.
 8   Q     Okay.  I just wanted to make sure.
 9   A     Yeah.
10   Q     So with Dr. Gaillich, other than you say Michael not
11   following up with appointments with his urologist, what
12   else was he noncompliant about according to Dr. Gaillich?
13   A     That's all I recall.
14   Q     How long was your phone conversation with
15   Dr. Gaillich or the assistant?
16   A     About the same, three to five minutes.
17   Q     Whether Michael Smith was compliant or not with his
18   cancer treatment, how would that effect the way that you
19   would treat him as a patient?
20   A     It would not.
21   Q     How would it affect the way you would treat him as a
22   patient with a serious medical condition?
23   A     It would not.
24   Q     So why is his compliance relevant?
25             MS. AH LOY:  Object.
```

Michael Scott Smith, APRN
8/18/2018

Page 67

1   **A**    Yes, sir.

2   **Q**    And again, when we're saying March 15th, we're

3   talking about 2016?

4   **A**    Yes, sir.

5   **Q**    Did you also receive Number 15 on March 15th?

6   **A**    Yes, sir.

7   **Q**    Did you also receive page number 1 on March 15th?

8   **A**    No, sir.

9   **Q**    Okay.  That's helpful.  Thank you.

10          MS. AH LOY:  And just for purpose of the

11   record, I will advise you that that fax at the top, the

12   6/19/18, I believe that was the fax to me.

13          MR. HOWE:  Sure.

14          MS. AH LOY:  Yeah.

15          MR. HOWE:  Sure.

16          MS. AH LOY:  So that's not him.

17          MR. HOWE:  Okay.

18   **Q**    (By Mr. Howe) Is it fair to -- looking at the rest

19   of these documents in this stack that I gave you -- and

20   I'll give you a binder clip too.

21   **A**    No, that's okay.  I have mine properly organized.

22   **Q**    Okay.  Great.

23   **A**    Yours are not properly organized.

24   **Q**    Okay.  Great.

25          Were there any other records that you received on

Michael Scott Smith, APRN
8/18/2018

Page 71

1   is put?

2   **A**    To make sure that they had also these records, I

3   brought a copy with me, and they assured me that they had

4   the copies.

5   **Q**    That they had the copies before you brought them on

6   the 21st?

7   **A**    Uh-huh.

8        Which I applaud them for taking the initiative,

9   whoever requested them.

10   **Q**    So when you got to the jail, did you pull a file of

11   Michael Smith or did you just bring your records?

12   **A**    I do not recall.

13   **Q**    You received these records on March 15th.  You went

14   and saw Michael Smith on March 21st.  Correct?

15   **A**    Correct.

16   **Q**    Did anybody from the jail, whether it be Turn Key

17   employees, medical staff, jail superintendent, detention

18   officers, did anybody from the jail contact you regarding

19   their treatment of Michael Smith?

20   **A**    Yes.

21   **Q**    Who contacted you?

22   **A**    Amity Williams.

23   **Q**    Do you recall when she contacted you?

24   **A**    I do.  It was on 18 March 2016.

25   **Q**    What was the reason why she contacted you?

Michael Scott Smith, APRN
8/18/2018

Page 73

```
 1   previous -- he had prostate cancer, Stage 4, metastasized
 2   to this point?
 3            MS. AH LOY:  Object to the form.
 4            THE WITNESS:  Yes, sir.  But I need to explain.
 5   Q   (By Mr. Howe) Sure.  Please do.  Please do.
 6   A   I already had the result of the bone scan that
 7   showed no collapse of the spinal column.  I also had
 8   results of a CAT scan that had been done just days prior
 9   to incarceration that showed no lytic lesions nor
10   collapse of the spinal column.
11       When I examined Mr. Smith, he was completely
12   functional and he complained of no leg weakness, he was
13   ambulatory, fully walking and functioning.
14   Q   So going -- and we'll get to that examination.
15   A   Yes, sir.
16   Q   The fact that he complained of back pain, though,
17   and he had metastatic cancer of the spine --
18   A   That would be expected.
19   Q   Well, I know.  Let me finish.
20   A   Yes, sir.
21   Q   -- would you at least agree that there was a warning
22   sign that you needed to be on -- you definitely needed to
23   monitor that?
24   A   Absolutely.
25            MS. AH LOY:  Object to the form.
```

Michael Scott Smith, APRN
8/18/2018

Page 74

1    **Q**    (By Mr. Howe) No?

2           MS. AH LOY:  You can answer.

3    **A**    Yes.

4    **Q**    (By Mr. Howe) But let me rephrase the question.

5    **A**    Uh-huh.

6    **Q**    Based on the fact that you knew about his previous

7    metastatic cancer to the spine and based on the fact that

8    he complained of back pain, would that cause you or did

9    that cause you to monitor his condition while he was at

10   the jail?

11          MS. AH LOY:  Object to the form.

12          Go ahead.

13   **Q**    (By Mr. Howe) Or how does that affect whether you

14   monitor him and the degree of monitoring?

15   **A**    We would already be done monitoring by the reception

16   of the records.

17   **Q**    But I'm not talking --

18   **A**    And requesting to see him and being vigilant.

19   **Q**    Well, we'll get to that.

20   **A**    Okay.

21   **Q**    I'm talking about after the 21st.  Was there

22   something that led you to believe, because of his serious

23   condition, you needed to pay attention to this case?

24          MS. AH LOY:  Object to the form.

25          You can answer.  Sorry.

Michael Scott Smith, APRN
8/18/2018

Page 75

```
1    A    Well -- well, certainly.

2    Q    (By Mr. Howe) Okay.  Is this -- I'm sorry.  Is this

3    funny?

4    A    No.

5    Q    Okay.  Because this is -- there's a smile on your

6    face.

7              MR. ARTUS:  There's been a smile on his face

8    throughout the whole deposition.

9              MR. HOWE:  Well, is that an objection?

10             MR. ARTUS:  Absolutely.  I think you're --

11             MS. AH LOY:  You're antagonizing the witness

12   and harassing him.

13             MR. HOWE:  No, I'm not antagonizing and I'm not

14   harassing him.

15             THE WITNESS:  Is this -- is this --

16             MR. HOWE:  We're talking about something very

17   serious now.

18             THE WITNESS:  Is this relevant?

19   Q    (By Mr. Howe) What I'm asking you is -- I'm not

20   trying to antagonize you, but we're talking about

21   something serious and there's -- there doesn't seem to be

22   the same concern that I have about the situation, so --

23   A    This is not appropriate, counselor.

24             MS. AH LOY:  No, it's not.

25             THE WITNESS:  It is -- it is -- it is -- it is
```

Michael Scott Smith, APRN
8/18/2018

Page 76

1    very inappropriate.

2    **Q**   (By Mr. Howe) Okay.  Well, I apologize.  And I'm not

3    trying to be rude, but this is a very serious matter, so

4    maybe I just misread your body language.

5    **A**   I am taking it very, very seriously.

6    **Q**   Okay.

7         MS. AH LOY:  And you're allowed to smile,

8    because you're a nice person.  You're allowed to continue

9    to do that.

10   **Q**   (By Mr. Howe) Yeah.  I'm not saying you can't smile.

11   **A**   This is absurd.

12   **Q**   So let me ask you another question.

13        If I offended you, I apologize.

14   **A**   Uh-huh.

15   **Q**   Let's get back on track.

16   **A**   I didn't get off track, sir.

17   **Q**   No.  I said I'd like to get back on track.  Is that

18   fair enough?

19   **A**   That is fair enough.

20   **Q**   Okay.

21        So after you reviewed -- and I'll take you to Number

22   12 -- TK12.  So if you go back to your exhibits, that is

23   after -- we're looking at the records from Dr. Eckenrode?

24   **A**   Uh-huh.

25   **Q**   You see here that Michael Smith -- there is a record

Michael Scott Smith, APRN
8/18/2018

Page 77

```
 1   from Northeastern Health System that is February 24th --
 2   A    Yes.
 3   Q    -- 2016.
 4   A    (Nods head)
 5   Q    Is that the bone scan you are referring to?
 6   A    It is.
 7   Q    What about this bone scan was important to you in
 8   terms of the way you rendered treatment to Michael Smith?
 9           MS. AH LOY:   Object to --
10   Q    (By Mr. Howe) -- at the time -- and let me ask you
11   this:  After you reviewed this record, did this -- did
12   this affect the way that -- your opinion or your
13   treatment of Michael Smith?
14   A    Yes.
15   Q    Okay.  What about it and --
16   A    Number one, it confirmed a Stage 4 cancer with a
17   metastatic process, which is, by definition, a Stage 4,
18   that it was not curable.  And I was very sorry for that,
19   because once it hits that point, there's no -- no cure.
20   None.
21   Q    Sure.  Sure.
22        What else about this was important to you?
23   A    That he had mets to the bone in several areas, that
24   his time on earth was probably very limited.
25   Q    What else about this scan was important to you in
```

Michael Scott Smith, APRN
8/18/2018

Page 78

```
 1    terms of the -- your diagnosis and treatment of

 2    Mr. Smith, with the symptoms he was complaining of?

 3    A    Well, there's no real treatment for this.  It is

 4    only, at that point, palliation.

 5    Q    What is palliation?  I don't know what that is.

 6    A    Just to provide whatever can be to slow whatever

 7    progression of the disease possible.  That is why I wrote

 8    the order that the family may bring a medication called

 9    Casodex to limit androgen, which feeds the cancer.  And

10    he assured me the family would bring it.

11    Q    Do you know if the family brought it?

12    A    I do not know.

13    Q    Do you know if the family attempted to bring it and

14    it wasn't --

15    A    I do not know.

16    Q    There was a period of time in which you followed up

17    with Michael Smith after his March 21st exam, wasn't

18    there?

19    A    No.

20    Q    You had one more exam?

21    A    No.

22    Q    You didn't have any more exams --

23    A    No.

24    Q    -- after March 21st?

25    A    No.  One time.
```

Michael Scott Smith, APRN
8/18/2018

Page 79

1   Q    You only saw him one time?

2   A    One time.  Yeah.

3   Q    Okay.

4        I'd like to turn your attention to -- we just looked

5   at page 12 and page 13.  Now what I'd like to do is I'd

6   like to turn your attention to page 16.

7        What about this medical record was important to you,

8   that you received on March 15th, 2016?

9   A    It was very, very good because there were no

10  evidence -- now, this is his chest X-ray.

11  Q    Yes.

12  A    Is that correct?

13  Q    Yes, sir.

14  A    There was no evidence of any pulmonary nodules,

15  anything like that.

16  Q    What is the significance of that?

17  A    That it had not spread into the lungs.

18       My wife has lung cancer --

19  Q    Okay.

20  A    -- counselor.

21  Q    Okay.  I apologize --

22  A    And that is something I take --

23  Q    Or my sympathies are with you.

24  A    -- very, very serious.

25  Q    Okay.

Michael Scott Smith, APRN
8/18/2018

Page 80

1  **A**    As I do all cancers.

2  **Q**    Absolutely.  I've been affected by cancer too.

3  **A**    She also has colon cancer.

4  **Q**    Okay.  My family has been affected by that too.  I

5  definitely -- I share --

6  **A**    I don't know that you do --

7  **Q**    -- what you're going through.

8  **A**    -- but that's fine.

9  **Q**    So now what I'm going to ask you is, with respect to

10  this record on 2/24/16, based on that, did that play an

11  impact in your diagnosis or opinion as far as how to

12  treat Smith?

13  **A**    I was relieved.

14  **Q**    Okay.  You were relieved.

15      Would this play a role into whether it would cause

16  him to have high blood pressure?

17  **A**    We obtain chest X-rays for a number of different

18  reasons, not only to assess for things like pneumonia,

19  other changes pulmonary-wise, but we would also take a

20  look -- it provides a picture of what we call the cardiac

21  system, the heart, the vasculature.  There was no

22  evidence of any congestive heart failure or pulmonary

23  vascular congestion.

24      But directly with blood pressure, no.

25  **Q**    So this -- this wouldn't affect blood pressure one

Michael Scott Smith, APRN
8/18/2018

Page 81

```
 1   way or another?
 2   A    No.  No.
 3   Q    Would this -- what was his other complaint?  He
 4   had --
 5   A    Back pain.
 6   Q    -- complaint of blood pressure, back pain?
 7   A    Yes.
 8   Q    And was there another symptom that you said?
 9   A    There was another --
10   Q    Chest pain.
11   A    -- of chest pain.
12   Q    Chest pain.
13        Now what I'd like to do is I'd like to turn your
14   attention to page 17 -- TK17, which follows.
15        Yeah.  Sir, they're not in numerical order.  It's
16   actually --
17            MS. AH LOY:  I think it might be after.
18            MR. HOWE:  It's directly after that other NSU
19   record regarding the chest X-ray.
20            MS. AH LOY:  If I can quit fumbling around.
21            THE WITNESS:  There we go.
22            Okay.  I'm there.
23   Q    (By Mr. Howe) This record here --
24   A    Yes.
25   Q    -- what is this record of?
```

Michael Scott Smith, APRN
8/18/2018

Page 85

1   **Q**    (By Mr. Howe) Another patient that complains of back
2   pain?
3   **A**    Yes, sir.
4   **Q**    And when we go to his blood count -- I'm going to
5   take you back.  I apologize.  I know we're flipping --
6   I'll turn you to -- it might help if I flipped you to
7   where we're going.
8         Let's see.  We're looking for -- are these your
9   documents or mine?  I don't see -- do we have --
10  **A**    I can locate it.
11  **Q**    There you go.  There you go.
12             MR. ARTUS:  Is that TK17?
13             THE WITNESS:  It is.
14  **Q**    (By Mr. Howe) TK17 and 18, the complete blood count,
15  when you look at this document, what does -- and this
16  shows that this was ordered on March 14th, 2016; correct?
17  **A**    Correct.
18  **Q**    That's the -- would you agree with me that's the day
19  before Michael Smith was taken into custody at the
20  Muskogee County Jail?
21  **A**    The day prior to incarceration.
22  **Q**    So it would lead you to believe that he was still
23  actually -- he was still appearing for doctors'
24  appointments?
25             MS. AH LOY:  Object to the form.

Michael Scott Smith, APRN
8/18/2018

Page 86

```
 1   A     This was in an emergency room.

 2   Q     (By Mr. Howe) Well, so he --

 3   A     No.  This was in an ER.

 4   Q     It was an ER?  Well, what was the purpose for him

 5   going to the ER?

 6   A     I don't know.

 7   Q     You would have --

 8   A     All I received was this as well as a CAT scan

 9   report.

10   Q     Okay.  And in this record, when you reviewed it,

11   would you agree with me that this complete blood count,

12   most, if not all, of his counts are not within the normal

13   range?

14             MS. AH LOY:  Object to the form.

15   Q     (By Mr. Howe) Looking at this record --

16   A     There are very minor changes that are not clinically

17   significant.

18   Q     Well, what are -- okay.  Are there any major changes

19   or major deviations from the normal range in this --

20   A     Nothing that would alarm any medical provider.

21   Q     And what are the minor deviations that are --

22   A     A very mild dropoff in his RBCs --

23   Q     Is that red blood cells?

24   A     -- red blood cells, hemoglobin and hematocrit.  But

25   not even close to even being alarming or certainly
```

Michael Scott Smith, APRN
8/18/2018

Page 87

1    requiring any transfusion.  Not even close.

2    **Q**    So when you say a transfusion, are you talking about

3    a blood transfusion?

4    **A**    Yes.

5    **Q**    So when -- in this case where you're talking about

6    this record, is it your opinion that when you reviewed it

7    that there was nothing alarming about it?

8    **A**    That's correct.

9    **Q**    In reviewing it, you said that there was minor

10   issues that were significant -- or --

11   **A**    No.

12   **Q**    I didn't mean minor issues that were significant.

13   **A**    No.

14   **Q**    Other than being within the normal -- other than --

15   excuse me.  I'm going to withdraw that question.

16        Was there anything about this record that you felt

17   was important -- important in treating Michael Smith?

18            MS. AH LOY:  Object to the form.

19   **Q**    (By Mr. Howe) In this record, when you reviewed

20   it --

21   **A**    Well, any information is certainly important.

22   **Q**    Sure.  But what I'm talking about, was there

23   anything in this record that you took into consideration

24   in your medical opinion of treating -- or your medical

25   opinion of Michael Smith?

Michael Scott Smith, APRN
8/18/2018

Page 88

1   **A**    I was relieved that it was so good.

2   **Q**    Okay.  When you reviewed this record, did it affect

3   in any way your treatment of Michael Smith?

4   **A**    Yes.

5   **Q**    How -- and I'm just saying, in terms of medically,

6   not -- how did it affect your treatment?

7   **A**    He did not require a blood transfusion.

8   **Q**    Okay.  So that's fair enough.

9         But would you agree with me that, just because

10  somebody may not require a blood transfusion, that

11  doesn't necessarily mean they're not suffering a serious

12  medical need?

13  **A**    Correct.

14  **Q**    Okay.  I now want to take you to -- if you go to

15  past the CBC record, it is NHS or Tahlequah City,

16  whatever they want to call it now -- and you go to page

17  14 -- sir, I'm going to turn you to it.

18  **A**    Are we going to talk about the electrolytes here?

19  **Q**    Do you have -- I don't know.  I'm going to ask you

20  because I don't know if this is significant or not.

21        So I've now got -- we're looking at TK14, which,

22  again, is part of Exhibit 1.

23  **A**    Yes, sir.

24  **Q**    This is a record that is dated --

25  **A**    2/24/16.

Michael Scott Smith, APRN
8/18/2018

1   Q    So which was about three weeks before --

2   A    Oh, no, no.  I'm sorry.  3/14/16.

3   Q    Okay.  So the day before Michael was taken into

4   custody.

5   A    Exactly right.

6   Q    Is this -- was your opinion -- this is also from

7   when he went to the ER?

8   A    Yes, sir.

9   Q    And it looks here that this was transcribed at

10  3:00 in the morning?

11  A    It would appear.  Yes, sir.

12  Q    When you looked at this record, what did you learn

13  from it that was important --

14  A    I was --

15  Q    Hold on a minute.

16  A    Okay.

17  Q    -- that was important in your diagnosis or treatment

18  of Mr. Smith while he was in the Muskogee County Jail?

19  A    There were no lytic lesions identified, no evidence

20  of any spinal cord collapse or compression.  Really,

21  really important.

22  Q    Okay.  Why is that important?

23  A    Because later on he complained and developed

24  paralysis.  At this time, the day prior to incarceration,

25  the CAT scan did not show anything significant that would

Michael Scott Smith, APRN
8/18/2018

Page 90

```
 1   lead me or anyone else to believe that Mr. Smith was
 2   ultimately or imminently going to be paralyzed.  I was
 3   relieved.
 4   Q    Sure.  But at the time that you had this record on
 5   March 15th --
 6   A    Uh-huh.
 7   Q    -- Mr. Smith hadn't become paralyzed.
 8   A    Correct.
 9   Q    Just because he wasn't -- didn't show a spinal
10   cord -- let's go this way.  You saw a collapsing of the
11   spinal cord or a collapse of the spinal cord?  What did
12   you say?
13   A    Neither one.
14   Q    Okay.
15   A    Neither one was present.
16   Q    Okay.  On March 14th, if he is receiving treatment
17   that shows there's no lytic lesions --
18   A    No -- what treatment?  There's no treatment.
19   Q    I'm sorry.  Radiology.  I'm saying radiology --
20   A    Yeah.  Okay.  There you go.
21   Q    But -- yeah, that's -- I apologize.  Thanks for
22   fixing that.
23        In this record, towards the bottom, it says osseous
24   structures, no lytic lesions identified.  Was this --
25   A    That is critical.
```

Michael Scott Smith, APRN
8/18/2018

Page 91

1   Q    Also says sclerosis of the posterior T11 vertebral
2   body is unchanged.  What does that mean?
3   A    Vertebral.  There's some scarring.
4   Q    What is the scarring caused by?  Do you know?
5   A    Probably the cancer.
6        And that was confirmed by way of the bone scan.
7   Q    Because of this --
8   A    But, again, no lytic lesions is important because
9   that means no cancer has actively eroded through the
10  spinal column.
11  Q    Just because --
12  A    Really important.
13  Q    Sure.
14       And, Nurse Smith, just because it hasn't already
15  eroded through the spinal column --
16  A    Uh-huh.
17  Q    -- it doesn't mean that it's not going to erode
18  through the spinal column; correct?
19  A    Correct.
20  Q    Would you agree with me that if somebody has this
21  type of cancer and they're suffering back pain, that
22  that's a symptom that could suggest that they're -- that
23  the spinal collapse could erode at a later date?
24  A    Potentially, yes.
25  Q    And they could actually be in the early stages of

Michael Scott Smith, APRN
8/18/2018

Page 92

```
 1   doing that when they suffer back pain; right?
 2           MS. AH LOY:  Object to the form.
 3   Q    (By Mr. Howe) In Michael Smith's condition, the fact
 4   that his spinal column wasn't -- you said eroding --
 5   A    On the date prior to incarceration.
 6   Q    -- on the date prior to incarceration --
 7   A    Yes.
 8   Q    -- the fact that he was having back pain while he
 9   was incarcerated, couldn't that also be that, just
10   because it wasn't eroding, that there were early signs
11   that it was starting to erode?
12   A    It's possible.  But on the date that I saw him on
13   the 21st, there was no functional loss.
14   Q    Okay.  On the day that you saw him on the 21st,
15   though, he was complaining of back pain.
16   A    But no functional loss.
17        In fact, I was surprised the nature of his
18   complaints, because his primary complaint was not the
19   back pain.
20   Q    What are early signs that somebody in Michael
21   Smith's medical condition, with Stage 4 metastatic cancer
22   to the spine --
23   A    Yes.
24   Q    -- is suffering early signs of a cord compression?
25   What do you look for?
```

Michael Scott Smith, APRN
8/18/2018

1   considering the fact that he suffered a cord compression?

2   **A**    Yes.  And the fact that he made no complaint of it

3   on the 21st.

4   **Q**    That's -- sir, that's -- that's what you say.  But

5   he's already testified and he has already --

6   **A**    He was under the influence of potent narcotics when

7   that testimony was taken.

8   **Q**    He also gave a five-hour deposition.

9   **A**    And you had to keep awakening him and redirecting

10  him.

11  **Q**    Sir, if you'd like to -- did you have a chance to --

12  well, have you had -- in preparing for your deposition

13  today, what did you do to prepare or review?  What did

14  you review?

15  **A**    I reviewed all records here.

16  **Q**    Did you review anything else?

17  **A**    No.  All the records in front of me right here.

18  **Q**    Okay.  Did you have an opportunity to watch the

19  deposition of Michael Smith that's videoed?

20  **A**    Video, no.

21  **Q**    So you're just speculating?

22  **A**    On -- no.

23  **Q**    Sir?

24  **A**    No.  It's in the transcript.

25  **Q**    What I'm asking you is:  You're speculating on

Michael Scott Smith, APRN
8/18/2018

Page 107

```
 1   whether Michael Smith was lucid or coherent enough to
 2   provide deposition testimony?
 3           MS. AH LOY:  Object to the form.
 4   Q    (By Mr. Howe) Because you haven't seen the video.
 5   A    Under the influence of the narcotics he was on, he
 6   was not even competent to sign any legal document nor
 7   medical consent.
 8   Q    But he was competent to provide a five-hour
 9   deposition and answer my questions, her questions, and
10   his questions.
11           MR. ARTUS:  That's yet to be decided,
12   Counselor.
13           MS. AH LOY:  Uh-huh.  And I object.
14           MR. HOWE:  I'm just saying, I think we're --
15           THE WITNESS:  He would not have been competent
16   to drive, he would not have been competent to give
17   medical consent for any procedure.
18   Q    (By Mr. Howe) Well, he would have been competent to
19   write a will.
20           MS. AH LOY:  Object to the form.
21   Q    (By Mr. Howe) Do you disagree that he was of sound
22   mind on that day?
23   A    I don't know.
24   Q    Have you read his almost 200-page deposition that
25   you believe he wasn't coherent enough for?
```

Michael Scott Smith, APRN
8/18/2018

1    Q    What is significant?

2    A    His blood pressure is exceeding the accepted values

3    both on the systolic end and the diastolic end.

4    Q    As a result of that, what does that mean?

5         Well, let me ask you this:  Does that show that he's

6    suffering a serious medical condition?

7    A    Yes.

8    Q    As a result of that medical condition, does that

9    require that he be taken to the hospital?

10   A    No.

11   Q    Why?

12   A    It is controllable on an outpatient level.

13   Q    He'd been in custody since March 15th; correct?

14   A    Correct.

15   Q    And by March 18th he was still suffering from high

16   blood pressure.

17   A    Well, sir, he was suffering from high blood pressure

18   even long before.

19   Q    Right.

20   A    It was accelerated blood pressure at this time,

21   exceeding the accepted values.

22   Q    So was his blood pressure getting worse or better in

23   your opinion?

24   A    Well, at that point --

25   Q    On March -- 15th of March.

Michael Scott Smith, APRN
8/18/2018

Page 111

```
 1   A    -- it was at this point in which intervention was
 2   provided.
 3   Q    So you believe that the way you treat that, you just
 4   give him blood pressure medicine?
 5   A    Yes.
 6   Q    What is clonidine used for?
 7   A    It is an antihypertensive.
 8   Q    Okay.  Is it used for anything else?
 9   A    We use it sometimes in children for ADHD.
10   Q    Is it used for anything else?
11   A    Sometimes we use a variation of it
12   psychiatrically --
13   Q    Okay.
14   A    -- to help impulsivity.
15   Q    Anything else --
16   A    Not that I can think of.
17   Q    -- you prescribe it for?
18   A    Well, sometimes for vasomotor symptoms associated
19   with menopause.
20   Q    Okay.  Can you think of any other reason?
21   A    Not really.
22   Q    In this case, is the reason -- why do you believe
23   Michael Smith was prescribed the clonidine?
24   A    For his accelerated hypertension.
25   Q    On this same record, if you go down, it says
```

Michael Scott Smith, APRN
8/18/2018

Page 113

1    **Q**    So that's not you?

2    **A**    No.

3    **Q**    Okay.  And what is lisinopril for?

4    **A**    It is an ACE inhibitor class medication for

5    hypertension.

6    **Q**    So blood pressure?

7    **A**    Blood pressure.

8    **Q**    Is it used for anything else?

9    **A**    It is.  It is used also to protect the kidneys from

10   what we refer to as nephropathy in people who are

11   diabetic.

12   **Q**    Anything else it's used for?

13   **A**    Not that I'm aware of.

14   **Q**    Okay.  What about -- will you say this word,

15   metoprolol?

16   **A**    Metoprolol.

17   **Q**    Metoprolol.

18   **A**    Yes.

19   **Q**    Okay.

20   **A**    The other name is Lopressor.

21   **Q**    All right.  It says here that Michael Smith was

22   prescribed 25 milligrams twice a day for 60 days.  What

23   do you prescribe -- you can say it.  What's that word?

24   **A**    Metoprolol.

25   **Q**    Metoprolol.

Michael Scott Smith, APRN
8/18/2018

Page 114

1    **A**    Uh-huh.

2    **Q**    Okay.  What do you prescribe metoprolol for?

3    **A**    For either accelerated heart rate and/or blood

4    pressure or if a person has congestive heart failure.  It

5    too has many reasons for prescription.

6    **Q**    And you didn't prescribe that; correct?

7    **A**    Yes.

8    **Q**    That's not your initials?

9    **A**    Yes.

10   **Q**    Oh.  That is your initials?

11   **A**    Yes.  All of these are my orders, just not my

12   initials.

13   **Q**    Oh, well -- but you -- so you are the one who

14   actually did prescribe the lisinopril?

15   **A**    Yes.

16   **Q**    Okay.  So are those -- next to -- let's go back to

17   the lisinopril --

18   **A**    Sure.

19   **Q**    -- where it says 60 days and then it says -- what is

20   that writing there?

21   **A**    Which writing?

22   **Q**    It almost looks like an M.M.

23   **A**    That's what it appears to me.

24   **Q**    Okay.  But that's not yours?

25   **A**    No.

Michael Scott Smith, APRN
8/18/2018

Page 115

1  **Q**    Okay.  But you are the one that -- you're the one
2  with the prescribing authority?
3  **A**    Yes.
4  **Q**    Gotcha.
5       And you were also the one with the prescribing
6  authority for the metoprolol?
7  **A**    Metoprolol, yes, sir.
8  **Q**    And then also again for the clonidine?
9  **A**    Exactly right.
10  **Q**    As needed.
11       And then it also states 160/100.
12  **A**    Uh-huh.
13  **Q**    Is that a record, when you read this, that's
14  referring to blood pressure?
15  **A**    It is.
16  **Q**    Is 160/100 a serious medical condition?
17  **A**    Potentially.
18  **Q**    What would make it more serious?  You say
19  potentially.  You qualified that answer.
20  **A**    Well, not really.
21       Rephrase the question, please.
22  **Q**    Sure.  In your opinion, is blood pressure 160/100 a
23  serious medical condition for a patient?
24  **A**    Yes.
25  **Q**    And then you -- so you say you also were the one who

Michael Scott Smith, APRN
8/18/2018

Page 116

```
 1   prescribed the clonidine; correct?

 2   A    Yes, sir.

 3   Q    Okay.  What was that for?  The high blood pressure

 4   we just said, right?

 5   A    Yes.

 6   Q    Or blood pressure medicine?

 7          MR. ARTUS:  Hypertension is what he said.

 8          MR. HOWE:  Okay.

 9   Q    (By Mr. Howe) Hypertension is low or high blood

10   pressure?

11   A    High.

12   Q    And hypotension is low blood pressure; right?

13   A    Hypotension is low blood pressure.

14   Q    Okay.  And then hyper is high blood pressure?

15   A    Yes, sir.

16   Q    Number 4, it says ibuprofen, 400 milligrams twice a

17   day for 60 days.  You prescribed that also, correct?

18   A    I did.

19   Q    What was the reason for that prescription?

20   A    For his complaint of pain.

21   Q    Pain where?

22   A    In his back.

23   Q    So 400 -- okay.  Then it also says, number 5, BPVS.

24   Will you please tell me what BPVS means?

25   A    Blood pressure checks.
```

Michael Scott Smith, APRN
8/18/2018

Page 117

1   **Q**   Okay.  Blood pressure checks.

2   **A**   Uh-huh.

3   **Q**   And then it says twice a day and record.

4   **A**   Yes.

5   **Q**   What is the reason why you ordered blood pressure

6   checks twice a day to record it?

7   **A**   His blood pressure was elevated.

8   **Q**   So it led you to believe that that was a serious

9   medical condition that needed to be monitored and checked

10  twice a day; right?

11  **A**   Correct.

12  **Q**   Then you've also got -- is it -- is it tamsulosin?

13  **A**   Yes.

14  **Q**   Got one right.

15      It says .4 milligrams.  What does that say?  I can't

16  read that writing.

17  **A**   0.4 milligrams PO -- in other words, by mouth -- Q

18  day times 60 days.  Which was a medication he had been

19  maintained on by his urologist as well as his oncologist.

20  **Q**   Sure.

21      And I apologize.  I didn't hear you when you said.

22  How often was he supposed to take that?

23  **A**   He was supposed to take it one time a day.

24  **Q**   Okay.  One time a day.

25  **A**   Yes, sir.

Michael Scott Smith, APRN
8/18/2018

Page 118

1   Q    Okay.  I could read most of that.

2        And then that was for 60 days.  And did you

3   prescribe that too?

4   A    I did.

5   Q    Okay.  Then what does -- you said it was prescribed

6   by the urologist or oncologist?  What does that treat?

7   A    It's a -- it treats a condition referred to as

8   benign prostatic hyperplasia.

9   Q    What is that?

10  A    Not to be confused with prostate cancer.

11       When we men of a certain age -- get to a certain

12  age, oftentimes our prostates enlarge.

13  Q    Sure.

14  A    And this is a medication designed to shrink that

15  gland to prevent what we refer to as obstructive

16  uropathy, to help him void.

17  Q    Basically to help him pee?

18  A    Yes.  By shrinking --

19  Q    Not to block the urethra so he can actually pee?

20  A    Exactly right.  Exactly right, sir.

21  Q    Okay.  Or urinate.

22  A    Yes.

23  Q    So the fact that he had prostate cancer, that also

24  contributes to an enlarged prostate, right?

25  A    Not necessarily.

Michael Scott Smith, APRN
8/18/2018

1   **Q**    Or does it?

2   **A**    No.  No.

3   **Q**    What about in Michael's case?  What did your --

4   **A**    No.  No.  I would say separate.

5   **Q**    So did he tell you that he was having trouble

6   urinating?

7   **A**    No.

8   **Q**    Did you just --

9   **A**    But it was part of his -- on his records from here

10  that we felt was going to be important to maintain safety

11  and comfort.

12  **Q**    So the reason why you said that is -- or the reason

13  why you prescribe many of these, is it because they were

14  his -- the medications that you learned about when you

15  reviewed his medical records?

16  **A**    Yes.

17  **Q**    So you were just making sure those prescriptions

18  were accurate, correct?

19  **A**    Yes.  And then to complete the process, when I

20  physically visited with him on the 21st, for instance, on

21  Casodex.

22  **Q**    And then we have Michael Smith here, correct?

23  **A**    Yes, sir.

24  **Q**    Is that your initials at the bottom there?

25  **A**    No.  Not my initials, my signature.

Michael Scott Smith, APRN
8/18/2018

Page 127

```
 1   the medications.  And we already went over these;
 2   correct?
 3   A    Yes, sir.
 4   Q    And then it says BPV, which is blood pressure
 5   checks.
 6   A    Yes.
 7   Q    Okay.  So that doesn't say BPVs.  That says BP
 8   checks?
 9   A    Yes, sir.
10   Q    Like a checkmark?
11   A    Yes.
12   Q    Okay.  That's helpful.
13        And then it says BD, which is bi-daily or twice
14   daily, until stable; correct?
15   A    Correct.
16   Q    In your review of Michael Smith's records related to
17   the time -- from the time he became a patient at the jail
18   until the time that he was released, was there a point at
19   which his pressure ever -- his blood pressure ever
20   stabilized?
21   A    At the time I saw him -- the one point that I saw
22   him on the 21st, it was still very elevated, so I added
23   another -- a third medication called amlodipine.
24   Q    Right.
25   A    Which is also known as Norvasc.  Because at that
```

Michael Scott Smith, APRN
8/18/2018

Page 139

```
 1   at that time there was a large turnover during that
 2   transition.
 3   Q    So do you think the transition played a role in the
 4   structure and the way the things -- the way the
 5   operations were?
 6   A    Just in that main movement.  Not in Turn -- in fact,
 7   Turn Key, when they came in, they came in with a set of
 8   really good policies, really good procedures.
 9        From what I could tell -- and again, keep in mind I
10   was only there a month -- probably very good people.
11   Q    How would you describe the policies and the
12   procedures that Turn Key had in place when you ended your
13   employment on March 5th of 2016 compared to now, when you
14   came back in January of 2018 under the new -- basically
15   with Rob Frazier as sheriff?
16   A    Very comprehensive, both, and I was very, very
17   pleased.
18   Q    So when you say "very comprehensive, both" --
19   A    Uh-huh.
20   Q    -- to make sure I and the jury understand you,
21   you're saying that the jail, in January 2018, has a --
22   you feel a more -- you feel it has a comprehensive
23   policy; correct?
24   A    Oh, yes.  Oh, yes.
25   Q    And you feel that Turn Key has a comprehensive
```

Michael Scott Smith, APRN
8/18/2018

Page 140

```
 1   policy?

 2   A    Oh, yes.

 3   Q    Do you feel that the jail, prior to January 2018 and

 4   before Turn Key took over, had a comprehensive policy?

 5   A    Not as comprehensive as what Turn Key initiated and

 6   that is present now.

 7   Q    What is more comprehensive?  What do you mean by

 8   that?

 9   A    Well, you would not believe the number of policies

10   that is -- that are present for virtually every

11   contingency.

12        And I suspect Allie could speak to that in terms of

13   providing some of the policies --

14   Q    Don't worry.  Allie's not in the hot seat.  We're

15   not going to take her deposition.

16        What I'm saying is, are you saying -- and I guess

17   what we'll go back to is maybe patient care.  What is

18   more comprehensive or what was less comprehensive?

19   A    I believe the staff is more protected and I believe

20   the patients are better served with the immediacy of the

21   care.

22   Q    When you say the staff is better protected --

23   A    Yes.

24   Q    -- what does that mean?

25   A    The policies and procedures protect the providers,
```

Michael Scott Smith, APRN
8/18/2018

Page 143

1   Q    Do you recall what he told you?  What do you say he
2   told you?
3        And I'm just saying -- and I don't -- I'm not
4   straying you from your notes.
5   A    Oh, no, no, no, no, no.
6   Q    You're more than welcome to look at your notes to
7   refresh.  I just
8   A    But it's better, just to speed --
9   Q    Yeah.  If you can think first, what do you recall
10  about him?
11  A    Yeah.  His first complaint was his cancer, and he
12  felt that possibly we had the wrong records.
13  Q    What was his complaint about his cancer?
14  A    That he had been diagnosed with prostate cancer and
15  that he was under the care of Dr. Eckenrode, and I
16  reassured him we had those records, and was under the
17  care of Dr. Gaillich, and I assured him we had those
18  records as well.
19  Q    What was his concern about his cancer while he was
20  in jail, though?  Not necessarily the records.  What was
21  his concern about?
22  A    That he would not --
23  Q    -- any symptoms or conditions his cancer was
24  causing?
25  A    That he would not be able to continue to receive

Michael Scott Smith, APRN
8/18/2018

Page 144

```
 1   care.
 2        And I assured him that those medicines would be
 3   continued even in an incarcerated state.
 4   Q    When Michael Smith was examined by you, what else
 5   did he tell you about his cancer?
 6   A    Directly with the cancer, that was it.
 7   Q    What were his complaints to you?
 8   A    His complaint were back pain, which I would have
 9   anticipated.
10   Q    Why would you have anticipated that?
11   A    Because oftentimes, obviously, with a metastatic
12   situation, you know, certainly with the back, after
13   having certainly reviewed the imaging and Dr. Eckenrode's
14   reports, that would have been concerning.  And I went
15   over those records with him.
16   Q    Did he tell you that he felt that something was
17   wrong with him?
18   A    No.
19   Q    Did he tell you that he thought that --
20   A    Well, wrong with him, that's --
21   Q    Yeah.  Let me fix that.  Did he tell you that he
22   felt that something was -- like something was seriously
23   wrong with his body?
24   A    No.
25   Q    Did he ask you to go to a hospital?
```

Michael Scott Smith, APRN
8/18/2018

Page 145

1    **A**    No.

2        I expected that and I was surprised he did not bring

3    it up.  Because oftentimes, you know, many people will --

4    you know, certainly in a situation like Michael's.  You

5    know, he did indicate he had prostate cancer with mets to

6    the bone -- metastatic situation to the bone.

7    **Q**    And what circumstances with the jail -- let me

8    rephrase my question.

9        When the jail takes patients to the hospital, that

10   costs the jail money; right?

11   **A**    Not necessarily.  No, no.

12   **Q**    The jail foots the bill.

13   **A**    No.  No.  That's not true.

14   **Q**    Who foots the bill?

15   **A**    If there's a preexisting condition, the patient

16   himself or herself is responsible for it.

17   **Q**    Were you aware that Michael Smith actually had

18   government health insurance?

19   **A**    We do not inquire.  It does not matter.

20   **Q**    Were you --

21   **A**    Because in an incarcerated state, the VA does not

22   recognize your veteran status; the Indian tribes do not

23   recognize your Indian status; Medicare does not recognize

24   your insured status.

25   **Q**    What is the reason -- I'll withdraw that question.

Michael Scott Smith, APRN
8/18/2018

Page 150

1   state 3/21/18?

2   **A**   It does -- '16.

3   **Q**   Oh, I apologize.  3/21/16.

4        What does that say next to where it says allergies?

5   **A**   Morphine sulfate.

6   **Q**   Then below that there's an arrow BP.  What does that

7   stand for?

8   **A**   Elevated blood pressure.

9   **Q**   Then it also states -- what is that under elevated

10  blood pressure?

11  **A**   Back pain.

12  **Q**   And then where it says HPI, that's -- is that

13  history and physical?  What does HPI stand for?

14  **A**   HPI, history of present illness.

15  **Q**   Yeah.  Present illness?

16  **A**   Uh-huh.

17  **Q**   What is your writing there?

18  **A**   History of prostate cancer with mets to the bone,

19  not under any active treatment except hormonal injections

20  every six months, due next June.

21  **Q**   With respect to where it says not under active

22  treatment, if -- what would he have had to do in order to

23  be under active treatment?

24  **A**   It's not possible with a Stage 4.

25  **Q**   So when you're saying under active treatment, you're

Michael Scott Smith, APRN
8/18/2018

1   just saying because it's not curable?

2   **A**   It's not curable.

3   **Q**   But you're not saying that he wasn't going to the

4   doctor and still being treated for cancer-related issues?

5   **A**   He was receiving hormonal treatment with injection

6   and orally with the Casodex.

7   **Q**   Also -- but he also, the day before he was brought

8   to the Muskogee County Jail, he had also had a complete

9   blood count?

10  **A**   Correct.

11  **Q**   That would be a form of treatment, lab work.

12  **A**   No.  No.  No.

13  **Q**   But that's --

14  **A**   It's a form of evaluation.

15  **Q**   Okay.  And radiology?

16  **A**   Labs don't treat.  Imaging doesn't treat.

17  **Q**   He was still having medical examinations related to

18  his previous cancer history.  Is that fair to say -- or

19  isn't that fair to say?

20  **A**   Yes.

21  **Q**   And he was in the jail in April and his next

22  injection wasn't scheduled until --

23  **A**   Until June.

24  **Q**   Well, it was due next for May.

25  **A**   Okay.  Okay.

Michael Scott Smith, APRN
8/18/2018

Page 152

1  **Q**    Would that surprise you?  So that would be less than

2  a month from the day he was released?  Would have been

3  April --

4  **A**    Which was actually a different injection than the

5  lupon.

6  **Q**    It was leuprolide acetate.

7  **A**    Yes.  Okay.

8  **Q**    But what I'm saying, though, is he was still

9  receiving that injection he was supposed to get every six

10  months and he was supposed to get another one that month;

11  right?

12         MS. AH LOY:  Object to the form, in that month.

13         MR. HOWE:  Sure.

14  **Q**    (By Mr. Howe) When I say "that month," I'm saying he

15  was due in May --

16  **A**    Not for lupon.

17  **Q**    But what -- do you recall what he was due for?

18  **A**    Yeah.  It's embedded here somewhere in

19  Dr. Eckenrode's records.

20  **Q**    Okay.

21  **A**    It was a second androgenic inhibitor.

22  **Q**    I have leuprolide acetate due every six months, and

23  it looks like his current -- if you go to the very first

24  page of the -- second page of those documents I initially

25  gave you from Dr. Eckenrode --

Michael Scott Smith, APRN
8/18/2018

Page 153

1   **A**    Here we go.  Trelstar.

2   **Q**    Where are you looking at?

3   **A**    Right here. (Indicating)

4   **Q**    Okay.  This is current outpatient prescriptions;

5   correct?  So where you're saying Trelstar, it says --

6   according to this, when was he due for it again?

7   **A**    Yeah.  In May.

8   **Q**    Right.

9   **A**    Yeah.  You're confusing the two.  But that's okay.

10  **Q**    Well, no.  And that's what -- you're the doctor -- I

11  mean the nurse --

12  **A**    No.  Nurse practitioner.

13  **Q**    I gotcha.  I caught myself that time.

14       You're the first nurse practitioner I've ever

15  deposed.  I'm used to doctors so --

16  **A**    That's okay.

17  **Q**    -- I continue to do that.

18  **A**    That's okay.

19  **Q**    But if I take you back to TK007 --

20  **A**    Uh-huh.

21  **Q**    -- it says that current facility administered

22  medication and says leuprolide acetate, six-month kit,

23  45 milligrams, and that was on 12/10/15.

24  **A**    Uh-huh.

25  **Q**    So are you saying that -- is it your testimony that

Michael Scott Smith, APRN
8/18/2018

Page 154

1   he was now supposed to get Trelstar?

2   **A**   No, no.  He gets both.

3   **Q**   He gets both.

4   **A**   He gets two injections and an oral pill.

5   **Q**   What is the first injection for, the leuprolide --

6   **A**   They're both -- they're both -- one is designed to

7   prevent the production of the male hormone.  The other is

8   to block at the receptor site the male hormone that feeds

9   the cancer.

10   **Q**   So they're cancer related?

11   **A**   Yes.  It is -- I hate to say it, but it's a chemical

12   castration.  It's the only way we have of managing it at

13   this stage.

14   **Q**   So when you say a chemical castration, to make sure

15   I understand, what does that mean and what does that

16   cause?

17   **A**   It causes -- it's actually -- the lupon is a female

18   hormone.

19   **Q**   When you say castration --

20   **A**   Yes.

21   **Q**   -- I'm saying -- in your term -- when I think of

22   castration, I think of something else.  So when you're

23   saying castration, I want to make sure I -- I don't think

24   it causes that, so --

25           MS. AH LOY:  He said chemical castration, to be

Michael Scott Smith, APRN
8/18/2018

Page 155

1   fair.

2   **Q**    (By Mr. Howe) Right.  So we're -- yeah.  That's what

3   I'm saying.  So a chemical castration.

4   **A**    It changes the level of the hormones in the body,

5   making less of the male hormone available that would feed

6   the cancer and make the cancer progress faster.

7   **Q**    How does that affect one's body, though, by having

8   that?  Why is it so sad?

9   **A**    You would become a little more feminized.

10  **Q**    Oh, okay.  So maybe you might have a softer voice --

11  **A**    Yes.

12  **Q**    -- or you might develop male breasts or --

13  **A**    Yes.

14  **Q**    -- some -- okay.

15  **A**    Yeah.

16  **Q**    I follow you.

17  **A**    Yeah.

18  **Q**    Now that makes sense to me.

19       When you said castration, I've never heard the term

20  "chemical castration."

21  **A**    The regimen is a legitimate regimen, it's a neutral

22  regimen, but it was apparent that Mr. Smith was in his

23  last stages and there was just -- essentially, you know,

24  probably should have been offered hospice.

25  **Q**    Smith should have been offered hospice?

Michael Scott Smith, APRN
8/18/2018

Page 156

1   **A**   I believe so.

2   **Q**   If he was in a condition to where he should have

3   been offered hospice when he's in the jail for this

4   period and he's suffering these serious medical

5   conditions we've already discussed, isn't there a

6   possibility -- or wouldn't that be more likely to warrant

7   that he be -- if he asked to go to a hospital, that he be

8   sent to a hospital?

9   **A**   No.   No.   In fact, a hospice patient would be turned

10   away.

11   **Q**   In Michael Smith's condition, if he says that he

12   wanted to go to -- or requested to go to the hospital

13   because he felt that he needed emergency medical care for

14   what he was going through, in that situation, would you

15   order it?

16   **A**   If there was an indication.   If there was an

17   indication.   Not just on say-so.

18   **Q**   I understand.   But what's the indication?   What do

19   you need in order to say -- you're asking to go to the

20   hospital, I'm going to send you to the hospital, and what

21   is the indication --

22   **A**   And many of the patients don't even ask it, but if

23   their blood pressure, for instance, is extraordinarily

24   high and we cannot get it down or they're having

25   intractable chest pain or intractable nausea and vomiting

Michael Scott Smith, APRN
8/18/2018

Page 157

1   or the worst headache of their life.

2   **Q**    But Stage 4 metastatic cancer to the spine with

3   severe back pain and then a history of -- and then also

4   in the record numbness of feet, that doesn't warrant

5   going to the hospital?

6   **A**    There's no treatment for it, no cure for it.

7   **Q**    I'm not talking about --

8   **A**    And that's the unfortunate part and I hate it.

9   **Q**    What about -- but in this case, Mr. Smith suffered a

10  cord compression.  He says that when he was suffering

11  back pain and these issues, he testified that he asked

12  and begged to go to the hospital.

13  **A**    I have no record of that.

14  **Q**    In that condition, if he had asked you to go to the

15  hospital and you were the final decision-maker, would you

16  have approved his request to go to the hospital?

17  **A**    Only if there was demonstrable objective findings.

18  **Q**    And that is fair.

19  **A**    Uh-huh.

20  **Q**    And then on your prescription orders -- I apologize

21  for flipping around.

22  **A**    I know.  That's --

23  **Q**    I want to take you back to TK20, which is your

24  record.

25       Is there anything significant in -- from where it

Michael Scott Smith, APRN
8/18/2018

Page 158

```
 1   says -- does that say pulse, 96?
 2   A    That is not significant.
 3   Q    No.  Okay.  But I'm saying is that what that says,
 4   your writing?
 5   A    No.  That's actually a pulse-ox.  That is his oxygen
 6   level.
 7   Q    Okay.  What does that measure?  What is the
 8   importance of that?
 9   A    To make sure that he's getting good air exchange.
10   Q    Does that -- at that level, is he getting good air
11   exchange?
12   A    He certainly is.  Yes, sir.
13   Q    And where it says BP, that's blood pressure; right?
14   A    Yes, sir.
15   Q    152 -- what does that say?
16   A    152/98.
17   Q    Is that high blood pressure, low blood pressure,
18   within the normal range?
19   A    Oh, no.  It's high.  It's exceeding the national
20   standard, the treatment standard, the target of 130/80.
21   That's elevated.
22   Q    Abnormal?
23   A    Abnormal.
24   Q    Dangerous?
25   A    No.
```

Michael Scott Smith, APRN
8/18/2018

1   Q    Somewhere between abnormal and dangerous?

2   A    Yes.  Longterm, yes.

3   Q    All right.  When you say longterm, what do you mean?

4   What is the duration of longterm?

5   A    It depends on co-morbidities.  If a person has, say,

6   renal dysfunction or is a cardiac patient, it would be

7   way too high.  But to the best of my knowledge, he was

8   neither one of those.

9   Q    Heart rate, is that -- HR, is that heart rate?

10  A    It is heart rate.  Yes, sir.

11  Q    53?

12  A    53.

13  Q    Is that --

14  A    Fantastic.  Because that lets me know that one of

15  his other medications was working, the metoprolol.  We

16  use metoprolol not only for blood pressure, but also to

17  take the workload of the heart to get it to relax

18  somewhat.  It's wonderful.

19  Q    Going down where it says general, NADAAOX4,

20  well-nourished.  Just in laymen's terms, explain to me

21  what you're saying there.

22  A    Normal.

23  Q    What's normal?

24  A    His appearance, his interaction, his --

25            MS. AH LOY:  I think he -- I'm sorry to

Michael Scott Smith, APRN
8/18/2018

Page 160

1    interrupt.

2              THE WITNESS:  Yeah.

3              MS. AH LOY:  I think he might be wanting you to

4    explain what the initials stand for.

5              THE WITNESS:  Oh, I'm so sorry.

6              MS. AH LOY:  Is that what you meant?

7              MR. HOWE:  Yeah.  Yes.

8              THE WITNESS:  No acute distress, alert and

9    oriented times 4 and well-nourished.

10             I know in medicine we use a lot --

11             MR. HOWE:  Yeah.

12   **Q**   (By Mr. Howe) And then with no acute distress, what

13   would somebody who's in acute distress, what symptoms

14   would they show?  Visible symptoms or --

15   **A**   Well, it depends on so many -- so many different

16   things.  Sometimes if it's pain and grimacing or moving

17   very slowly, what we call antalgic or painfully.  It

18   could be tearful, very dysphoric, because we see a lot of

19   mental health patients as well.  Clutching at chest.

20   **Q**   Alert -- and then you said alert and oriented times

21   four?

22   **A**   Yes, sir.

23   **Q**   Explain to me and the jury what that means.

24   **A**   That means interacting normally, alert and oriented

25   times four, to person, place, time, and situation.  In

Michael Scott Smith, APRN
8/18/2018

Page 161

```
 1    other words, he was in his right mind.
 2    Q    And well-nourished means that he looked like he was
 3    eating --
 4    A    Yes.
 5    Q    -- wasn't malnourished?
 6    A    He was not malnourished, did not appear -- did not
 7    appear what we call cachectic or cachexic, you know, kind
 8    of, you know, wanting for anything.
 9    Q    What visible symptoms would somebody have or --
10    yeah.  Basically, what visible symptoms would you see in
11    somebody who is malnourished?
12    A    Disruption in the integrity of the skin, the
13    integumentary system.
14    Q    What does that -- like what would that be?  Like
15    skin color, jaundice, something like that?
16    A    Not necessarily jaundiced, but just wasted, where
17    they don't have a lot of what we call adiposity, where
18    it's just muscle or loose skin.
19    Q    Okay.
20    A    In very, very serious cases, there can be changes
21    even in the scalp and in the hair.
22    Q    Right.  Alopecia?
23    A    Yes.  Yes.
24    Q    Then it says -- as we go down, it says heart RRR.
25    What does that mean?
```

Michael Scott Smith, APRN
8/18/2018

1   **A**   Regular rate and rhythm.

2   **Q**   So his heart was functioning --

3   **A**   It was.

4   **Q**   -- according to you, fine.

5   **A**   Yes, sir.

6   **Q**   And then lungs CTA?

7   **A**   Clear to auscultation.

8   **Q**   Then it says that -- then down here it says

9   assessment.  Tell me what that writing says.

10  **A**   Prostate cancer with mets to the bone.

11      I did not do well in penmanship.  I am so sorry.

12  **Q**   Lawyers and doctors flop on penmanship.

13          MS. AH LOY:  It's not the worst I've seen.

14  **Q**   (By Mr. Howe) Thank goodness for keyboards.  Really.

15  **A**   And then below that is the abbreviation for

16  hypertension.

17  **Q**   Okay.  So he was still suffering from hypertension?

18  **A**   Yes.

19  **Q**   And then you have -- tell me what number 1 is.

20  **A**   And that's amlodipine, 10 milligrams, one PO took by

21  mouth, daily.

22      The other name for amlodipine is Norvasc.  It's a

23  calcium channel blocker; in fact, the number one

24  prescribed anti-hypertensive in the world.

25          And then -- I'm sorry.

Michael Scott Smith, APRN
8/18/2018

Page 163

1  Q    Did you -- so did you supply or provide that for the
2  high blood pressure?
3  A    Yes, sir, I did.
4  Q    Prescribed it?
5  A    Yes.
6  Q    And then number 2, what's that say?
7  A    Family may bring Casodex, 50 milligrams, one by
8  mouth BID or two times a day.
9  Q    Casodex is for what?
10 A    It is also, in his case, for cancer.  We use it to
11 treat other things had like endometriosis in women.
12 Q    Sure.
13 A    Although we have better treatment now.
14 Q    Is it a necessary -- and if somebody not getting
15 their Casodex or not getting their Casodex and they have
16 cancer, what is the risk?
17 A    It could cause an acceleration.
18 Q    Well --
19 A    In Mr. Smith's case, it was probably too late, but
20 you have to try it.  And I believe that's what Dr.
21 Eckenrode and Dr. Gaillich were attempting to do.
22 Q    So getting that Casodex would have been important
23 for Mr. Smith?
24        MS. AH LOY:  Object to the form.
25 Q    (By Mr. Howe) Or let me ask -- I'll rephrase it.

Michael Scott Smith, APRN
8/18/2018

Page 164

1       The fact that Mr. Smith had a prescription for
2   Casodex, would it be important for him to get his
3   Casodex?
4   **A**    Not short term.  Longterm, it would have been,
5   because he was still covered with the two injectable
6   agents.
7   **Q**    Even though he had the injectable agents, would he
8   still be better off with the Casodex?
9   **A**    Probably not.
10  **Q**    So why would it be important for the family to bring
11  it if it's not, in your --
12  **A**    I wanted to --
13  **Q**    Hold on a minute.
14  **A**    Okay.
15  **Q**    -- if in your opinion it's not really important?
16  **A**    I wanted to try to replicate, to the best of my
17  ability, his treatment regimen that he was receiving
18  outside as in an incarcerated state.
19  **Q**    So you believed, in your opinion, that he should be
20  able to have his Casodex and should get it?
21  **A**    Well, yes.  But I did not regard it as medically
22  critical.  And I hate that.  I --
23  **Q**    Why do you hate that?
24  **A**    I hate cancer.  I despise cancer.
25  **Q**    Why did you not regard it as medically critical,

Michael Scott Smith, APRN
8/18/2018

Page 165

1   though?

2   **A**   Because --

3   **Q**   Why do you hate the -- that's what I'm trying to get

4   at.

5   **A**   His condition was beyond what Casodex or anything

6   else could have helped.

7   **Q**   Are you aware that he actually lived for another

8   year and a half after he was released?

9   **A**   I believe it.  With his type of cancer.

10  **Q**   I'm just saying are you aware of that?

11  **A**   No.

12      At the time he was diagnosed in 2012, he had a

13  29 percent chance of survivability of surviving five

14  years.  29 percent.

15  **Q**   Uh-huh.

16  **A**   At the time -- at the point he was seen in 2016, he

17  had a 1 percent chance of surviving one year.

18  **Q**   Uh-huh.

19  **A**   He did good.  He did good.

20  **Q**   He was also -- you're aware he was also paralyzed --

21  **A**   That's what I understand, yes.

22  **Q**   -- during that last year and a half of his life?

23  **A**   Yes.

24  **Q**   That's tragic, isn't it?

25  **A**   It is.  It's horrible.  That's --

Michael Scott Smith, APRN
8/18/2018

Page 166

1   **Q**    Where it says Number 3, DC ibuprofen when
2   meloxicam --
3   **A**    Is available.
4   **Q**    What does DC mean, again?
5   **A**    Oh.  Discontinue.
6   **Q**    Discontinue ibuprofen.
7   **A**    Yes, sir.  Yes, sir.
8   **Q**    So were you saying that if meloxicam is available,
9   give him the meloxicam?
10  **A**    When I noted the records from Dr. Gaillich and
11  certainly Dr. Eckenrode, the meloxicam had been
12  prescribed by, most recently, Dr. Eckenrode.  Again, I
13  wanted to replicate his medication profile.  And until we
14  got the meloxicam, I had provided ibuprofen --
15  **Q**    Uh-huh.
16  **A**    -- just until the meloxicam came in --
17  **Q**    So what is the -- I didn't mean to interrupt you.
18  The meloxicam, what is that prescribed for, to treat?
19  **A**    It's a potent nonsteroidal anti-inflammatory for
20  pain.
21  **Q**    Treats bone and joint pain?
22  **A**    Oh, yes, it does.  Yes, sir.
23  **Q**    Arthritis?
24  **A**    Yes, sir.
25  **Q**    And then the meloxicam --

Michael Scott Smith, APRN
8/18/2018

Page 167

1    **A**    Yes.

2    **Q**    -- it says -- what does Number 4 say, meloxicam --

3    **A**    15 milligrams, one PO Q day, family may bring.

4         Because Mr. Smith assured me his family and -- well,

5    he had enough that the family could bring from home.

6         And the meloxicam, I had -- you know, the 15

7    milligrams is a maximum dosage.  I wanted to maximize

8    every opportunity for pain control, because I knew that

9    would be an issue.

10   **Q**    Looking back on it, when we're talking about

11   Mr. Smith, even when he was a patient of yours, you

12   viewed it as -- did you view it as a grim situation?

13   **A**    Oh, yes.

14   **Q**    Being that it was a grim situation, if he requested

15   to go to the hospital, would it -- would that play --

16   **A**    If --

17   **Q**    Hold on.

18        -- would that play into your decision of whether to

19   approve that or not?

20   **A**    Approve what?

21   **Q**    The fact that you say he was a grim situation, you

22   felt from your compassionate -- if he says he has to go

23   to the hospital, whether it's through you or somebody

24   else, would that make you more likely to approve that

25   order so he could go to the hospital and get the help

Michael Scott Smith, APRN
8/18/2018

Page 168

1    that he felt he needed, the emergency help?

2    **A**     No.  I used to work the emergency room and so I am

3    very aware of admitting patients at the emergency room,

4    and he likely would have been turned around at that time

5    and sent back.

6    **Q**     On March 21st?

7    **A**     Yes.  Yes.

8         The emergency room does a really good job of

9    life-saving situations, limb life-saving situations, but

10   in terms of essentially hospice care, no.  They may have

11   prescribed a pain medicine and sent him back.

12   **Q**     Well, four days later -- if you turn to the next

13   page, where it says TK05.  This is a note by -- I believe

14   it's Cindy Bilyeu.

15        Are you able to find it?

16   **A**     I'll find it here.

17   **Q**     Here, this one --

18   **A**     There.  Got it.

19   **Q**     Okay.  Did you find it?

20   **A**     Yes, sir.

21   **Q**     All right.  This is a note by Cindy Bilyeu on March

22   25th, 2016, says patient brought to medical stating his

23   legs and feet are numb.

24        The fact that he's now complaining that his legs and

25   feet are numb, does that demonstrate to you early signs

Michael Scott Smith, APRN
8/18/2018

Page 180

1    in a minute.

2         March 28th, 2016, the next record, TK03, it says,

3    name, Michael Smith.  That's referring to my client or --

4    not to you, but, of course, the patient.

5         Where it says 3/28/16, this is a record by

6    Loretta -- or I'm sorry.

7              MR. HOWE:  Is this Dorothy Lynn Lee?

8              MS. AH LOY:  Doretha --

9              MR. HOWE:  Doretha.

10             MS. AH LOY:  -- Lynn Lee.

11             MR. HOWE:  I've been wanting to get that right.

12   Doretha.

13   Q    (By Mr. Howe) This record shows that -- it says

14   inmate -- we like the word "patient" -- states that his

15   legs are not working.

16             MS. AH LOY:  Object to the form in that you

17   read in language that is not contained in there.

18             MR. HOWE:  I just said -- okay.  That's fine.

19   Q    (By Mr. Howe) It states that his legs are not

20   working and he has fallen several times.

21        Is that important to you?

22   A    I believe it is, yes, sir.

23   Q    That's a serious medical condition, isn't it?

24   A    It is, potentially, yes.

25   Q    Especially when it's -- but then it says no signs of

Michael Scott Smith, APRN
8/18/2018

Page 185

1   **Q**    Do you -- rephrase.

2        While you were treating Michael Smith, do you know

3   if there was a file where all his records were kept?  I

4   guess -- would it be a medical chart?

5   **A**    There would be a medical chart.  Yes, sir.

6   **Q**    Where would that have been kept?

7   **A**    It would have been kept in the medical section,

8   which adjoins the exam room.

9   **Q**    Which any of the --

10  **A**    It's kind of an administrative area with the

11  computers and the files and the medicines and then an

12  exam room that adjoins it.

13  **Q**    Which any of the nurses or medical staff --

14  **A**    Would have access to, yes, sir.  Yes.

15  **Q**    Did you ever have any conversations, other than the

16  ones we talked about, with Cindy Bilyeu, Amity Lee -- or

17  I'm sorry -- Amity Williams or Doretha Lynn Lee, about

18  Michael Smith?

19  **A**    Other than what I've disclosed already, not that I

20  recall, Counsel, no.

21          MR. HOWE:  Give me one second.

22  **Q**    (By Mr. Howe) Did you ever tell Michael Smith that

23  he didn't have cancer anymore?

24  **A**    Oh, no.

25  **Q**    Based on what you know, is that a true or a false

Michael Scott Smith, APRN
8/18/2018

Page 186

1   statement?

2   **A**    Oh.  Oh, it's a true statement.  I never told him he

3   never had cancer.

4   **Q**    Right.  But if --

5   **A**    Oh, my gosh.

6   **Q**    In the event some -- if anyone -- if any of the

7   deputies or the jail staff or Turn Key ever told Michael

8   Smith that he didn't have cancer anymore, would you agree

9   or disagree with that?

10  **A**    Oh, I would disagree with that.  Oh, my.

11  **Q**    Were you ever notified that Michael Smith had passed

12  out when he was booked in?

13  **A**    No.

14  **Q**    Were you ever notified that that -- of any of the

15  prior treatment that he had other than what he was in the

16  records prior to your examination of him on March 21st?

17  **A**    No.  That's why the record was so valuable even

18  prior to my visit.  It became a really valuable visit.

19         I don't like to guess.  You can't guess.  When

20  you're a carpenter, you can get a new board, but with a

21  human being, you can't get a new human.

22  **Q**    Are you familiar with the effect on a patient's

23  bowels when they suffer a cord compression?

24  **A**    Yes.

25  **Q**    Can you explain to me what occurs?

Michael Scott Smith, APRN
8/18/2018

Page 192

1    Q     I'm going to jump around.

2    A     That's okay.

3    Q     Were you ever aware of any instant of Michael Smith

4    having passed out before you saw him?

5    A     No.

6    Q     Did you ever personally observe Michael Smith pass

7    out?

8    A     No.

9    Q     Did anyone report to you that Michael Smith had

10   passed out?

11   A     No.

12   Q     I just want to make --

13   A     That would have changed the complexion.

14   Q     Okay.  And I just want to make sure -- we didn't go

15   through your medical history, but I just want to make

16   sure the record is clear.  You're not a medical doctor;

17   correct?

18   A     Correct.  I am a nurse practitioner.  That's right.

19   Q     Let's see here.  Did you ever review the actual

20   radiology films --

21   A     No.

22   Q     -- of Michael Smith?

23   A     Because I am not a trained radiologist, I depend on

24   someone who has dedicated their life, their profession to

25   reading the films.

Michael Scott Smith, APRN
8/18/2018

Page 193

1   Q     So is all you would have had the actual report?

2   A     Which is much more valuable.

3   Q     Do you believe, in your professional opinion, that

4   Michael Smith developed prostate cancer during his 18-day

5   incarceration at Muskogee County Jail?

6   A     Oh, no.  It was in 2011 it was formally diagnosed.

7   And I hate that.  There would have been a window for

8   opportunity for treatment and possibly cure within

9   probably the first year.  But at the time we saw him,

10  there was virtually no possibility of anything positive

11  in terms of curability or in terms of improving the

12  quality of life.

13  Q     Do you believe, in your professional opinion, that

14  Michael Smith's prostate cancer metastasized further

15  during his 18-day incarceration --

16  A     Absolutely not.

17  Q     -- at Muskogee County Jail?

18  A     It is a very slow-growing tumor that is well

19  established.

20  Q     Did you ever believe, while Michael Smith was under

21  your care, that he was suffering from a serious medical

22  need that was not already being treated?

23  A     As far as I can determine, the staff was very

24  responsive.

25  Q     Did you ever refuse to provide care to Michael

Michael Scott Smith, APRN
8/18/2018

Page 194

1    Smith?

2    **A**    Oh.  Never.  By common sense and profession, both

3    spiritually and professionally, I would have done

4    whatever would have needed to be done.

5    **Q**    Do you believe any other Turn Key providers refused

6    to provide care to Michael Smith?

7            MR. HOWE:  Objection.  Calls for speculation.

8    **Q**    (By Ms. Ah Loy) Do you have any reason to believe

9    that any other Turn Key provider refused to provide care

10   to Michael Smith?

11   **A**    No.  That would have been grounds for immediate

12   dismissal and loss of license.

13   **Q**    Did Turn Key have any policies or procedures that

14   told providers to deny care to patients?

15   **A**    No.  In fact, we have adopted Turn Key policies and

16   procedures at the current time, even though Turn Key is

17   not the medical provider.  They are that strong.

18   **Q**    If you go to TK4 -- it's one of the pages that he

19   gave you -- there was a little bit that I think needs to

20   be clarified for the record and I just wanted to take you

21   to it, because I think there was a little confusing

22   testimony earlier.

23           I'm looking for the right page.  The orders.  Where

24   are your orders?

25           There.  Okay.  So TK19 is what I'm looking at.

Michael Scott Smith, APRN
8/18/2018

1        Earlier, counsel was questioning you about the

2    second entry on 3/18/16, the clonidine order?

3    **A**    Yes.

4    **Q**    Okay.  Can you --

5    **A**    Number 3.  Yes.

6    **Q**    And specifically, he mentioned the blood pressure of

7    160/100.

8        I just want you to explain what -- what is that --

9    **A**    What that is, that's what we refer to as a PRN

10   order.  In other words, it is not routine.  That if

11   Mr. Smith's blood pressure exceeds 160 on the top,

12   systolic, or more than 100 at the bottom, that gives the

13   staff the ability to treat on the spot.

14   **Q**    Okay.

15   **A**    While we're not delaying care.

16   **Q**    So that's not a blood pressure that Mr. Smith

17   actually had?

18   **A**    Oh, no, no, no.  No.  Not at all.  Not at all.  No.

19            MR. HOWE:  So, Allie, to clarify, where we say

20   BP, is that like a greater-than sign?

21            MS. AH LOY:  Yes, that is --

22            THE WITNESS:  Yes.

23            MS. AH LOY:  -- a greater-than sign.

24            MR. HOWE:  Okay.

25            MS. AH LOY:  That's what I was trying to clear

Michael Scott Smith, APRN
8/18/2018

Page 196

1   up.  Sorry.

2          MR. HOWE:  Sure.  Yes.

3   Q   (By Ms. Ah Loy) When you personally spoke with

4   Michael Smith, did he give you any idea of when he

5   thought he was going to be released from jail?

6   A   I will never inquire the nature of a patient's

7   charges, but oftentimes I will inquire how long do you

8   expect to be with us.  And he did not give any

9   indication.

10  Q   Earlier, when counsel was questioning you, you

11  described a grim situation regarding Mr. Smith?

12  A   Yes.

13  Q   What did you mean by grim situation?  Were you

14  talking about his prognosis or his clinical presentation?

15  A   Prognosis.  When I received the records on the 15th,

16  it was apparent to me he was already at a Stage 4,

17  already had the metastatic situation into his

18  musculoskeletal system.

19  Q   Do you think, in your professional medical opinion,

20  that if Michael Smith had been transferred to a hospital

21  at any point during his March 2016 incarceration, that it

22  would have changed his outcome?

23  A   No.

24          MR. HOWE:  Objection to form.

25  Q   (By Ms. Ah Loy) I think I might have already asked

Michael Scott Smith, APRN
8/18/2018

Page 197

```
1    this.  Did you ever personally observe Michael Smith
2    fall?
3    A    No.
4    Q    Did you ever personally observe Michael Smith lying
5    on the floor?
6    A    No.
7    Q    Did you ever personally observe Michael Smith
8    sitting in his own urine or feces?
9    A    Oh, no.
10   Q    Did anyone at the Muskogee County Jail tell you that
11   they had personally observed Michael Smith fall?
12   A    No.
13   Q    Did anyone at the Muskogee County Jail tell you that
14   they had personally observed Michael Smith lying on the
15   floor in his own waste?
16   A    No.
17   Q    When you saw Michael Smith and examined him, did he
18   tell you that he had passed out earlier in his
19   incarceration?
20   A    No.
21   Q    Did anyone else --
22   A    And he was moving without limitation.
23           MS. AH LOY:  I think that's all my questions.
24   I'll pass the witness.
25           THE WITNESS:  Wow.
```

Michael Scott Smith, APRN
8/18/2018

Page 198

1                         CROSS-EXAMINATION

2    BY MR. ARTUS:

3    Q    I have a few questions.  It's Andy Artus.  I'm the

4    attorney for Sheriff Frazier.  I can say, hopefully, I

5    have not very long, because there have been a lot of

6    questions asked.

7         I represent Sheriff Frazier in his official

8    capacity, who's been sued in this case, and the Board of

9    County Commissioners of Muskogee County.

10        And from listening to your testimony, I got the

11   impression -- and I just want to make sure that I got the

12   correct impression -- that the policy at the jail at the

13   time these incidents are alleged to have occurred, which

14   would have been March 15th, 2016, through April 2nd,

15   2016, would you agree that the policy at the jail was to

16   provide medical care to inmates?

17   A    Yes, sir.

18   Q    And that same thing for Turn Key:  Turn Key had a

19   policy to provide medical care to inmates?

20   A    Yes, sir.

21   Q    Okay.  Would it be against the policy of the jail to

22   deny inmates medical care?

23   A    Absolutely unequivocally so.

24   Q    And at the time that we're talking about, I think I

25   understood it to say that you didn't work for the jail

Michael Scott Smith, APRN
8/18/2018

Page 199

```
 1   but you worked as an contract employee, you think, for
 2   Turn Key?
 3   A    I believe.
 4   Q    Okay.  But definitely not for the jail; correct?
 5   A    No.  That is correct.
 6   Q    You agree with that?
 7   A    Yes, sir.
 8   Q    And did you, at any time during this treatment --
 9   during his stay there, during your times you saw him or
10   reviewing the records, did at any time you realize that
11   he had a cord compression?
12   A    No.
13   Q    And did you or -- did you or, to your knowledge,
14   anyone from Turn Key instruct any jailers to send him to
15   the hospital?
16   A    No.
17   Q    And the jailers generally provide -- follow the --
18   your instructions.  If you tell a jailer to take him to
19   the hospital, they would do that?
20   A    Oh, yes, sir.
21   Q    And same thing with the medical staff, the jailers
22   follow what the medical staff says?
23   A    In fact, they're usually more than willing.
24   Q    Would you agree that the jailers follow what you --
25   A    Oh, yes.
```

Michael Scott Smith, APRN
8/18/2018

Page 200

1   **Q**    -- or any medical staff says to do?  Is that

2   correct?

3   **A**    Yes, sir.

4   **Q**    Okay.  And do you agree -- following up on what was

5   asked just a few minutes ago, do you agree that letting

6   an inmate lay in his own urine or feces would be against

7   policy?

8   **A**    Beyond the shadow of a doubt, yes, sir.

9   **Q**    Okay.  For the jail and for Turn Key?  Would you

10  agree with that?

11  **A**    Yes.

12          MR. HOWE:  Objection to form.  That --

13          THE WITNESS:  Yes.

14          MR. ARTUS:  I think that's all I've got.

15          THE WITNESS:  Wow.

16          MR. ARTUS:  I pass the witness.

17          MR. HOWE:  Allen?

18          We have no further questions.

19          MS. AH LOY:  Yes.  He'll read and sign.

20          (Deposition concluded)

21                          * * * * * *

22

23

24

25